SALLY CONFORTE, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

JOSEPH CONFORTE, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 8217–78, 8218–78.    Filed September 8, 1980.

*Bruce I. Hochman, Harvey D. Tack,* and *Stanley H. Brown,* for the petitioners.

*S. Clay Freed* and *Gordon W. Cook,* for the respondent.

STERRETT, *Judge:* By statutory notice dated April 14, 1978, respondent determined a deficiency in Mr. Joseph Conforte's income taxes and additions to tax as follows:

| Year | Deficiency | Sec. 6653(b) addition to tax |
| --- | --- | --- |
| 1973 | $1,142,054.00 | $598,943.00 |
| 1974 | 1,189,391.00 | 622,701.50 |
| 1975 | 1,228,480.20 | 642,248.60 |
| 1976 | 1,207,831.00 | 631,918.00 |

On the same day, a similar statutory notice of deficiency was sent to Mrs. Conforte. The deficiency and additions to tax pertaining to Mrs. Conforte were slightly lower than those

stated above for the reason that self-employment tax was attributed only to Mr. Conforte.

These cases were consolidated for the purpose of trial, briefing, and opinion. After concessions by both parties, the remaining issues are as shown below:

(1) Whether the respondent's determination in each statutory notice of deficiency was arbitrary and excessive, and if so, on which issues does respondent have the burden of proof; (2) what is the correct net income of the Starlight Brothel for each year, and what portion of it is taxable to petitioners; (3) what is the correct net income of the Mustang Ranch Brothel for each year; (4) did the petitioners file "returns" sufficient to qualify as joint returns; (5) did the petitioners file "returns" sufficient to enable them to avail themselves of the maximum tax provisions of section 1348 of the Internal Revenue Code, and if so, are the petitioners entitled to the benefits of the maximum tax; (6) did either petitioner intentionally file a false return, subjecting either of them to the fraud penalty under section 6653(b), and if so, did they file "returns" sufficient to permit computation of the fraud penalty against the deficiency after credit for taxes reported on the returns. In the alternative, are the voluntary payments of tax to be deducted from the tax in computing the penalty; (7) is the assessment for the year 1973 barred by the statute of limitations under section 6501(a); and (8) are the taxpayers entitled to a business deduction under section 162 or 616(a) during the years 1974–76, or to a charitable deduction under section 170 during 1976 for the building and dedication of the road, bridge, and underpass to Storey County.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the supplemental stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference.

Petitioners Sally Conforte's and Joseph Conforte's principal place of residence at the time of filing their petition herein was Sparks, Nev.

Petitioners, who were married to each other during the years 1973 through 1976, jointly executed a Form 1040, U.S. Individual Income Tax Return for each of those years. Each of the tax returns contained the taxpayers' names, address, social security

numbers, the filing status of "married, filing joint return," exemptions, amount designated as taxable income and computations of income and self-employment tax. Each return further contained a statement, reciting in some detail that the taxpayers were informed and believed that they were under criminal investigation by various agencies, and that the tax returns would be scrutinized by such agencies with a view to securing information that would lead to prosecution. The taxpayers then respectfully asserted their Fifth Amendment privilege with respect to setting forth the details of income and expense which could be used against them, relying upon applicable case law recited in the statement. The statement concluded by noting that the taxpayers had furnished, on the return, their taxable income which they believed to be correct, from which they had computed their tax liability, and noted that, if the Internal Revenue Service determined through appropriate processes that they were obligated to pay additional tax, they would comply with that determination.

The tax returns for 1973, 1974, 1975, and 1976 were processed by the Ogden Service Center in the traditional manner. Each return was posted for filing, giving a document locator, and payment of taxes recorded in the following amounts:

| | |
|---|---|
| 1973 | $111,664.00 |
| 1974 | 112,022.80 |
| 1975 | 112,033.90 |
| 1976 | 112,008.70 |

Payment of 1973 and 1974 taxes accompanied the returns; payments of the 1975 and 1976 taxes were made in installments. An estimated tax penalty was imposed for each year shortly after receiving the return, and interest was assessed on all eight payments. The 1973 and 1974 returns were selected for audit on December 10, 1974, and November 10, 1975, respectively.

The petitioners owned and operated, in varying degrees, the Mustang Ranch Brothel (sometimes Mustang Ranch or Mustang) located in Storey County, Nev. The brothel was a legal business in Storey County and was licensed by it.

Following a Federal grand jury investigation, petitioners were indicted, on April 5, 1977, in the U.S. District Court for the District of Nevada in a 10-count indictment charging a willful attempt to evade and defeat withholding and Federal Insurance

Contributions Act taxes, arising out of the operation of the Mustang Ranch Brothel. The 10 counts dealt with the first quarter of 1974 through the second quarter of 1976. Petitioners were acquitted on 6 counts, convicted on 4 counts, and sentenced on October 28, 1977.

The grand jury record was not used in the formation of the statutory notices herein; only the criminal trial record and fruits of respondent's agents' investigation were used for such purpose.

Ronald Wiggins, an experienced revenue agent, was assigned the task of examining petitioners' tax returns on November 10, 1977. He had earlier examined the 1967 through 1969 returns and made no adjustments with respect thereto. The purpose of his examination was to determine petitioners' tax liability. He was not advised at the time about the possibility of a jeopardy assessment, but 3 or 4 days later he was asked to make a computation based on the information available. At that time he had a sparse file, containing the Forms 1040, a copy of Exhibit 44 (hereinafter referred to as a "trick" sheet, which reflected the earnings of each prostitute for a given period of time) from the criminal employment tax case, and other various items.

Between November of 1977 and February of 1978, Agent Wiggins issued a summons to the electric power company, obtained the amount of license fees paid from the county sheriff's office, and went to the Storey County assessor to obtain property and real estate tax payment records. In January 1978, he received and read the transcript from the criminal employment tax case to determine allowable expenses. He called Stanley Brown, the general attorney for petitioners, to determine the amount of the legal fees paid. No expenses were allowed without substantiation of the nature of the services performed.

Agent Wiggins prepared a jeopardy assessment computation on or about February 17, 1978. The assessment relating to the Mustang Ranch Brothel was based primarily on the trick sheet from the criminal employment tax case. In that trial, the trick sheet was represented to be a one-page listing of 38 prostitutes and the gross receipts taken in by each during a 12-hour night shift. The total gross receipts from prostitutes was $4,961. In addition, the sheet reflected $70 of income from "check in," $1,000 withdrawn during the evening by Mr. Conforte, and

expenses of $3,982. Agent Wiggins determined that the gross receipts for a 24-hour day should be computed by taking the receipts for the evening of $4,961, estimating that the day shift did 50 percent of the business of the night shift, or $2,480.50, with a resultant figure in daily gross receipts of $7,441.50. He then multiplied the daily receipts by 365 days, thereby determining that the annual gross receipts of the Mustang Ranch were $2,716,147.50 for each of the years 1973 through 1976.

The evidence discloses that there was a wide disparity in the earnings of prostitutes at the Mustang. The trick sheet shows that 2 of the 38 women had no earnings. The largest amount of gross receipts taken in by any prostitute was $736. The next highest amount of receipts was $472, and the remaining 34 prostitutes grossed between $10 and $260. A similar disparity is reflected in the testimony of the prostitutes during the trial. Ten prostitutes, who had worked at the Mustang during the years in issue, testified that their net earnings ranged from $1,400 a week during the summer ($700 in the winter) to $200 a week in the summer ($150 in the winter). From their earnings, the prostitutes were expected to pay for their supplies; pay $1 for each item of laundry washed at the Mustang; tip each maid, cashier, cook, and the manager $1 per day; pay for their venereal disease examinations by a doctor; have an expensive "dressy" and casual "out-date" outfit; and have their hair done regularly.

Based upon Agent Wiggins' review of the criminal transcript, he determined that the prostitutes received 50 percent of the gross receipts and then made payment to petitioners for "room and board." He determined that the net amount paid to the prostitutes was 45 percent of the gross receipts and allowed a deduction for that amount. At trial, the parties stipulated that the amount realized as a result of each prostitute's activities during a shift is split evenly between the prostitutes and the house. From the prostitute's share is deducted an amount up to $10 which represents 10 percent of her earnings. In the event the prostitute's share is less than $50 per shift, there is no 10-percent deduction. In the event her share is more than $100, only $10 is deducted by the house. The stipulated division results in a slightly larger deduction than 45 percent of the gross receipts from prostitution, the amount allowed. A deduction for "salaries and wages—other" was based upon the daily wage figures for nonprostitute help reflectd in the criminal trial, multiplied by

the average number of people described in the transcript. A rental expense was allowed based upon the testimony of the landlord that $500 per month was paid for rent in cash. A deduction for utilities was allowed based upon information that Agent Wiggins received from the electric company. A deduction for taxes and licenses was allowed as ascertained from the records of the county sheriff and assessor. A. deduction for groceries was allowed based upon testimony in the employment tax case that the average daily amount paid for groceries was up to $150.

In preparing the jeopardy assessment, Agent Wiggins did not use the expense figure of $3,982 from the trick sheet in making his projection, because he did not feel that the expenses were adequately substantiated. Without the knowledge of what the money was actually spent for, he would not project the expense figure. In addition, there was testimony in the criminal case that the figure represented wages of the prostitutes and other help. When Agent Wiggins first made a computation for the jeopardy assessment, he used joint return rates; when it was concluded, he used married, filing separate rates.

After the jeopardy assessment was made, Agent Wiggins was advised by Stanley Brown, the Confortes' attorney, that the petitioners owned an interest in the Starlight Brothel (sometimes Starlight Ranch or Starlight) and the land on which it was located, that Gloria Elliott (also known as Kitty Bono) ran the operation, and that the profits were split. He also received some records of Sleepy Hollow Trailer Park, and found some itemized deductions.

On April 14, 1978, a statutory notice of deficiency was issued to Joseph Conforte based upon Agent Wiggins' computation. The notice set forth deficiencies in tax and penalty, as follows:

| Calendar year | Income tax | Fraud penalty | Total |
|---|---|---|---|
| 1973 | $1,142,054.00 | $598,943.00 | $1,740,997.00 |
| 1974 | 1,189,391.00 | 622,701.50 | 1,812,092.50 |
| 1975 | 1,228,480.20 | 642,248.60 | 1,870,728.80 |
| 1976 | 1,207,831.00 | 631,918.00 | 1,839,749.00 |

On the same date, a statutory notice of deficiency was issued to Sally Conforte, based upon Agent Wiggins' computations, setting forth deficiencies in tax and penalty as follows:

| Calendar year | Income tax | Fraud penalty | Total |
|---|---|---|---|
| 1973 | $1,141,190.00 | $598,511.00 | $1,739,701.00 |
| 1974 | 1,188,349.00 | 622,180.00 | 1,810,529.00 |
| 1975 | 1,227,366.20 | 641,691.60 | 1,869,057.80 |
| 1976 | 1,206,623.00 | 631,313.50 | 1,837,936.50 |

Agent Wiggins determined the receipts, expense, and net income of the Mustang Ranch brothel to be:

| | 1973 | 1974 | 1975 | 1976 |
|---|---|---|---|---|
| **Income** | | | | |
| Gross receipts from prostitution | $2,716,148 | $2,716,148 | $2,716,148 | $2,716,148 |
| **Expense** | | | | |
| Salaries and wages— prostitutes | 1,222,267 | 1,222,267 | 1,222,267 | 1,222,267 |
| Salaries and wages— other | 103,065 | 105,709 | 131,404 | 140,468 |
| Rent | 6,000 | 6,000 | 6,000 | 6,000 |
| Utilities | 829 | 6,082 | 9,724 | 14,834 |
| Taxes and licenses | 26,044 | 25,000 | 25,526 | 31,650 |
| Groceries | 54,750 | 54,750 | 54,750 | 54,750 |
| Bank charges | 0 | 0 | 0 | 35 |
| Payroll taxes | 0 | 0 | 0 | 3,551 |
| Total expenses | 1,412,955 | 1,419,808 | 1,449,671 | 1,473,555 |
| Net income | 1,303,193 | 1,296,340 | 1,266,477 | 1,242,593 |

The entire amount of this income was attributed to both Mr. and Mrs. Conforte.

Agent Wiggins determined the receipts, expenses, and net income of the Starlight brothel to be:

|  | 1973 | 1974 | 1975 | 1976 |
|---|---|---|---|---|
| **Income** | | | | |
| Gross receipts from prostitution | $787,305 | $922,720 | $1,078,575 | $1,078,575 |
| | | | | |
| **Expenses** | | | | |
| Salaries and wages— prostitutes | 354,237 | 415,224 | 485,359 | 485,359 |
| Materials and supplies | 8,053 | 8,053 | 8,676 | 8,676 |
| Taxes on business property | 12,000 | 12,000 | 12,000 | 12,000 |
| Cal-Gas Propane Co. | 1,424 | 1,424 | 1,511 | 1,511 |
| Water | 1,472 | 1,472 | 1,461 | 1,461 |
| Waste removal | 72 | 72 | 72 | 72 |
| Depreciation | 110 | 110 | 99 | 99 |
| Sierra Pacific Power | 2,398 | 2,398 | 2,485 | 2,485 |
| Total expenses | 379,766 | 440,753 | 511,663 | 511,663 |
| Net income | 407,539 | 481,967 | 566,912 | 566,912 |

The entire amount of this income was attributed to both Mr. and Mrs. Conforte.

In determining the gross receipts of the Starlight, Agent Wiggins was told by Revenue Agent Zuver that Zuver had interviewed a prostitute, named "Miko," who had said that she earned $20,000 a year from the Starlight. In order for a prostitute to earn $20,000, based upon the split of the gross receipts, she would have had to gross $44,444. Agent Wiggins determined that the average prostitute worked 3 weeks on and 1 week off, or 273 days per year. He divided the 273 days into $44,444 gross receipts to arrive at a daily gross receipts per prostitute of $162.80. Agent Wiggins was also told by Agent Zuver that Zuver had reviewed the State medical records and had determined that the average number of girls during the years 1973 through 1976 ranged from 13 to 18. Agent Wiggins then multiplied the $162.80 average receipts per prostitute by the number of prostitutes working per year, as determined by Agent Zuver, times 365 days. The expense for "salaries and wages—prostitutes" was determined in the same manner as that for the Mustang Ranch, i.e., 45 percent of the gross receipts. The division of gross receipts at the Starlight was actually the same as the Mustang. The balance of the expenses were those claimed on the Elliotts' personal tax returns.

At the time the statutory notices were issued in this case, Agent Wiggins had ascertained that the income from the Starlight Ranch was reported in the standard format on the Schedule C's in the personal income tax returns of Gloria Elliott, the manager of the Starlight Brothel. The net income of the Starlight as set forth in those returns was:

| Year | Net income | Year | Net income |
|------|-----------|------|-----------|
| 1973 | $27,500 | 1975 | $35,200 |
| 1974 | 31,000 | 1976 | 43,068 |

All of the Starlight net income was attributed to both Mr. and Mrs. Conforte, and a statutory notice of deficiency was issued to Gloria Elliott on April 13, 1979, for the years 1974 and 1975, attributing all of the Starlight net income to her. Mrs. Elliott has contested that determination.

In making the income computation for the Starlight in the statutory notice, Agent Wiggins used the information received from Agent Zuver without verifying it. He did not interview any prostitutes who had worked at the Starlight, did not ascertain the number of prostitutes who worked solely on weekends, the earnings of prostitutes other than Miko, whether Miko was a top prostitute or average prostitute or whether the prostitutes received income which was not shared with the house. He had never been assigned the returns of Gloria Elliott for examination. Agent Wiggins did not discuss with Mr. Brown the question of the income of the Starlight, even though Brown had voluntarily told him of petitioners' interest and profit-sharing with Mrs. Elliott.

The statements of Miko were not admitted into evidence in this case. Miko was a top earner at the Starlight and her earnings were not typical.

Agent Wiggins, after personally reviewing the State medical records, determined that the number of prostitutes working at the Starlight was as follows:

| | Weekly exams at Starlight on Friday evenings | Estimated number of prostitutes working per week |
|------|------|------|
| 1974 | 13.2 | 14.3 |
| 1975 | 15.7 | 17.1 |
| 1976 | 14.2 | 15.4 |

The above computation of prostitutes working at the Starlight does not take into consideration the possibility that there were fewer prostitutes working on weekdays than on weekends and, further, treats each prostitute examined by the doctor on the weekend as working the entire week. The computation also assumes that each prostitute examined was working, and does not exclude prostitutes examined who may have been ill and not working. Further, it does not exclude prostitutes who were examined and left the brothel for their vacations, while it includes prostitutes examined for more than 3 consecutive Fridays. Generally, the prostitutes were expected to work 3 weekends and be off a fourth. Finally, the above computation does not take into consideration that some prostitutes were examined by a doctor other than Dr. White, the Starlight house doctor.

During the trial, it was established that Gloria Elliott ran the Starlight Ranch for petitioners. She retained one-third of the net income from the operation, and paid two-thirds to petitioners.

During 1973, there were 12 rooms at the Starlight. During the years 1974 through 1976, there were 16 rooms. In addition to prostitution, the Starlight derived profits from the sale of liquor and T-shirts.

Prior to May 1976, the Mustang Ranch Brothel consisted of 45 rooms. The old Mustang, in reality a trailer-park, was located on property rented from the Peri brothers. In May 1976, the old Mustang was closed, but a new structure located on land owned by petitioners was opened. This new Mustang consists of a complex resembling a spoked wheel. At the hub of the wheel is an octagonal-shaped building containing the main parlor, a bar, space for the cashier and security personnel, a room for waiting cab drivers, and storage room. The main parlor is approximately $30 \times 55$ feet. The bar is approximately 30 feet long. The hub of the wheel is ringed with a hallway from which 7 spokes or wings radiate. Four of the seven wings, containing approximately 56 rooms, are reserved for prostitution. One wing is devoted to kitchen and dining facilities; another wing is devoted to general use and includes a large spa. The remaining wing consists of office space, a beauty parlor, other rooms necessary for the operation of a brothel, and a living quarter. Petitioners reopened the old Mustang in October 1976.

When a customer entered the brothel, the prostitutes lined up and the customer made his selection. The prostitute and customer then went to her room, and she negotiated, in private, for the service to be performed and fee to be charged. The prostitute then collected the money and turned it in to the cashier. The brothel set minimum fees, beginning at $10, but the prostitutes would encourage the customer to spend more. In violation of house rules, prostitutes would, on occasion, not turn in all of the money they had received from a customer.

Business at the Mustang was better in the summer than in the winter and greater on weekends than on weekdays. Included in the business of the Mustang Ranch would also be "out-dates." These were dates on which the customer took the prostitute out of the house for a period of time which could run as long as 3 days. Out-dates were prepaid by the customer. Mr. Conforte gave out complimentary passes to customers of Mustang Ranch, known as "house dates." The customer would be given a card containing a dollar denomination of its value initialed by Mr. Conforte. The house dates were treated as gross receipts on the accounting sheets kept by the cashiers and would be included in the total daily gross receipts. The values of these house dates were not actually gross receipts, since the services were complimentary. The cashiers treated the house passes as money in their recordkeeping, even though no money was received and the prostitutes were paid 50 percent of the amount of the house pass, which item was then treated as an expense.

All prostitutes working at the Mustang received medical examinations at least once a week, including when they reported for work, when they were ill, when they returned to work after being out of the house for 48 hours, and as to some prostitutes, when they were going home. The prostitutes were examined at the Mustang on Sunday, Monday, or Tuesday, and sporadically at the office of Dr. Nelson, the Mustang house doctor. Some prostitutes were examined by the doctor and never came to work, or only stayed a day or so. Upon completion of the examination, Dr. Nelson would send the slides and other information to the Nevada State health authorities to be analyzed in their laboratories. A comparison of the Nevada State health laboratories and the physician's daily records of Dr. Nelson shows that the average number of prostitutes at the Mustang during the years in issue was as follows:

| | |
|---|---|
| 1973 | 41.47 |
| 1974 | 41.12 |
| 1975 | 38.32 |
| 1976 | 41.30 |

The above computation attempts to take into consideration possible duplications of women who were examined more than once during the week. It assumes that a woman, who was examined on a Monday, would work the entire week. With respect to the year 1973, the schedule begins on May 28 and concludes on November 19. Thus, the slow season of the winter is excluded. The year 1974 excludes the period January 1 to April 22 or a portion of the slow winter period. With respect to the year 1975, the above data is based solely on the State health slips, as Dr. Nelson's records were not available. As to those women who were checked on their way out of the Mustang, the computation would overstate the number of women available for work that day. If a woman were checked by a doctor other than Dr. Nelson, she would not be included, and the estimate would be understated. The computation includes all slides taken by Dr. Nelson at the Mustang, even if the woman examined was possibly not a prostitute. The rules of the house require a prostitute to work 3 weeks and take off 1. When working, she is required to be examined weeky by Dr. Nelson.

Both the Mustang and the Starlight were operated almost exclusively in cash throughout the years at issue. The prostitutes and employees were generally paid daily and in cash. All expenses of the Mustang were paid in cash, including the license fee paid to Storey County.

The contemporaneous records at the Mustang were systematically burned. These records would include the cashier checkout sheet, master sheet of the prostitutes' earnings, and the itemized expenses. Petitioners would receive a "closing sheet," similar to the trick sheet, which would set out each prostitute's earnings, miscellaneous income, total expenses for the day, and any withdrawals by Mr. Conforte. Mrs. Lynn, the manager of the Mustang since 1970, never made any entry into, or saw, any master set of books for the Mustang.

In 1967, Mr. Conforte opened the Starlight. The Court does not have the entire chain of title of the property on which the Starlight was located. Gloria Elliott was named trustee on a deed of trust dated April 10, 1972, in which First American Title

Co. was designated trustee, and Edith Thompson, beneficiary. The property upon which the Starlight was located was the subject of the deed of trust. By assignment of deed of trust dated April 11, 1972, Edith Thompson transferred her interest therein to Mr. Conforte. By quitclaim deed dated June 18, 1973, Mrs. Elliott quitclaimed her interest to Mr. Conforte. By grant, bargain, and sale deed dated May 29, 1979, Wayne and Gloria Elliott transferred their interest in the Starlight property to Mr. Conforte. The April 10, 1972, deed of trust was not recorded until May 29, 1979. The other documents, transferring interest to Mr. Conforte, were not recorded until June 1979.

During the years in issue, petitioners received two-thirds of the profits of the Starlight and Mrs. Elliott retained one-third. This is true even though petitioners had total ownership of the Starlight. Mrs. Elliott would place petitioners' share of the profits, the slips from the prostitutes, and a list of the expenses paid out during the week in a paper bag. She delivered the paper bag to the Mustang and handed it over to petitioners. All of the payments from Mrs. Elliott to petitioners were in cash.

In 1969, petitioners purchased property in Storey County, Nev. (hereinafter referred to as the ranch), from James O. Parker and Jeanne N. Parker. As additional consideration for the purchase, petitioners agreed to form a joint venture with the sellers for the mining of a valuable sand deposit located on the ranch.

The ranch is located in the northern part of Storey County. It is bounded on the east by a high range of mountains, on the west by the Peri Ranch, and on the north by the Truckee River, which forms the boundary between Storey County and Washoe County. To the immediate north of the Truckee River lie railroad tracks constituting the main east-west line of the Southern Pacific Railroad. The McCarran Ranch lies to the south of the ranch and is relatively inaccessible.

At the time petitioners purchased the ranch, the sole access was over an unimproved dirt road across the Peri Ranch. Traveling from the Parker Ranch across the Peri Ranch, the road in question eventually crossed the Southern Pacific right-of-way, a dangerous railroad crossing, and reached the main highway to Reno. The road across the Peri Ranch also constituted access to the Mustang brothel, which was then located solely on the Peri Ranch. In 1965, the Parkers had attempted to utilize the road over the Peri Ranch for the purpose of hauling

sand from the sand deposits on the ranch. Their attempt to do so resulted in litigation, and a Court order enjoining the Parkers and others from burdening the easement over the Peri property by hauling sand over the road. As a result, the sand on the ranch was inaccessible. Under their agreement with the Parkers, petitioners agreed to obtain access to the ranch for the purpose of mining and selling the sand. When their negotiations for access over the Peri Ranch failed to bear fruit, they searched for alternative means.

Sometime thereafter, petitioners learned that a parcel of land immediately across the Truckee River from the ranch might be available for sale. The land in question (the north parcel) was owned by Southern Pacific and was no longer on the tax rolls. In August 1972, Southern Pacific executed a quitclaim deed conveying all of its right, title, and interest to Parco Sand & Gravel Co. (Parco), reserving its railroad right-of-way and pipeline easement in return for the sum of $1,500. Parco was a corporation whose stock was owned by Mr. Conforte. It was initially formed to market sand on the ranch and was subsequently used in negotiations with Southern Pacific and Storey County. Parco acted solely as Conforte's nominee. The money ostensibly expended by it was actually furnished by Mr. Conforte, deposited in the clients' trust account of Stanley Brown, and disbursed directly to payees by check. Both Southern Pacific and the chairman of the Storey County commissioners knew that petitioners, not Parco, were to pay for the cost of the bridge, underpass, and roadway. Petitioners entered into an agreement with Southern Pacific whereby the railroad granted an easement under its tracks on the north parcel to Storey County. In return, petitioners deposited the sum of $55,500 with Southern Pacific to construct the underpass.

Petitioners also commenced work on a bridge over the Truckee River linking the north parcel with the ranch. The easement and new bridge across the Truckee River had the effect of opening up the northern part of Storey County to development, increasing the tax base, and providing access for fire fighting. Petitioners' arrangement with Southern Pacific provided that petitioners would pay the cost of constructing the underpass, bridge, and road. Commencing in 1972, the petitioners expended funds for this purpose, including the sum of $8,900 in 1972, $55,626.98 in 1974, $81,547.63 in 1975, and $7,640.86 in

1976. The $8,900 expended in 1972 includes the $1,500 paid to Southern Pacific for the north parcel. In April of 1974, the Storey County commissioners resolved to accept the easement under the Southern Pacific railroad tracks for the underpass. The acceptance was conditioned on the fact that it would be constructed free of cost to the county and that the project and access road would be dedicated for unrestricted public use.

By deed dated October 28, 1975, Parco Sand & Gravel Co. conveyed to petitioners certain real property consisting of a roadway easement across the property which had previously been deeded by Southern Pacific to Parco. The roadway easement terminated at the Truckee River. The easement does not say whether it terminates on the north or south bank of the river.

By deed dated October 28, 1975, petitioners quitclaimed and dedicated to Storey County, Nev., the roadway easement they had received from Parco. This easement was for the purpose of a public road and, as a condition for the conveyance, Storey County agreed to utilize the easement for that purpose and no other. Under the provisions of the deed dedicating the easement to Storey County, the easement automatically reverted to petitioners or their heirs should any part of it ever be used for a purpose inconsistent with that of a public roadway.

During 1976, petitioners paid legal fees to Stanley H. Brown in the amount of $57,149, 80 percent of which is claimed by petitioners to be deductible as ordinary and necessary business expenses of the Mustang Ranch. Mr. Brown did not keep detailed records for the year 1976 and did not send itemized bills to petitioners. The 80 percent claimed to be a business deduction related to matters involving two grand jury investigations of petitioners. The first grand jury investigation was a Washoe County grand jury which issued its report in March 1976, and was critical of Mr. Conforte's influence in Washoe County. The second grand jury investigation involved matters relating to purported violations by petitioners of Federal immigration laws, voting laws, alcohol and tobacco tax laws, income tax and withholding tax laws, Federal firearm laws, obstruction of justice, and murder. The county grand jury specifically found that Mr. Conforte was guilty of no crimes. The Federal grand jury investigation returned an indictment in the criminal employment tax case.

OPINION

Generally, the burden of proof with respect to income tax deficiencies is on petitioners. *Welch v. Helvering*, 290 U.S. 111 (1933). Absent a finding that respondent's determination is arbitrary and excessive, petitioners must go forward and establish by a preponderance of the evidence that respondent's determination is erroneous. *Helvering v. Taylor*, 293 U.S. 507 (1935); *American Pipe & Steel Corp. v. Commissioner*, 243 F.2d 125, 126, 127 (9th Cir. 1957), affg. 25 T.C. 351 (1955), cert. denied 355 U.S. 906 (1957). In this Court, the above rule has been applied uniformly to both omission from gross income and deduction cases. *Weimerskirch v. Commissioner*, 67 T.C. 672, 674 (1977), revd. on another issue 596 F.2d 358 (9th Cir. 1979); *Greenberg's Express, Inc. v. Commissioner*, 62 T.C. 324, 330 (1974). Recognizing, however, that in the former situation petitioner must prove a negative, we have relaxed the quantum of evidence necessary to make out a prima facie case of nonreceipt of income. *Jackson v. Commissioner*, 73 T.C. 394 (1979).

On the other hand, respondent has the burden of proof if he raises a new matter at trial or seeks to impose a penalty for fraudulent underpayment. Rule 142, Tax Court Rules of Practice and Procedure. Further, respondent must prove fraud by clear and convincing evidence. Sec. 7454, I.R.C. 1954.

With the above in mind, we turn to petitioners' first three arguments regarding the shifting of the burden of proof.

First, citing *Helvering v. Taylor*, 293 U.S. 507 (1935), and its progeny, petitioners contend that the statutory notices in general, as they relate to omissions of income from the Mustang Ranch and the Starlight Ranch, are arbitrary and excessive.

Secondly, petitioners contend they have established that respondent's determination with respect to omission of income from the Mustang Ranch and the Starlight Ranch is erroneous and that, therefore, under *Herbert v. Commissioner*, 377 F.2d 65, 69 (9th Cir. 1967), revg. a Memorandum Opinion of this Court, and *Cohen v. Commissioner*, 266 F.2d 5, 11 (9th Cir. 1959), revg. a Memorandum Opinion of this Court, the burden of proof shifts to respondent.

Thirdly, petitioners argue that respondent has changed his method of determining the taxable income of the Mustang Ranch, that this change represents new matter within the

meaning of Rule 142, Tax Court Rules of Practice and Procedure, and, therefore, the burden of proof is on respondent.

Specifically, petitioners allege that the following facts establish that the notice was arbitrary and capricious.

(1) Allowance of only 1 month's utility expense for the year 1973.

(2) The manner in which Agent Wiggins computed the deduction for payments to prostitutes, a flat 45 percent, rather than computing the deduction based upon the manner in which "board" was actually computed.

(3) The failure of respondent to investigate, in any fashion, the amount of expenses known to exist.

(4) The failure of respondent to allow an estimate of expenses known to exist, but at that time unsubstantiated, as computed by Agent Wiggins prior to issuance of the statutory notices.

(5) The failure of respondent to attempt, independently, to investigate the receipts of the Mustang by interviewing cashiers, maids, prostitutes, or other knowledgeable persons.

(6) Ignoring the community property laws, failing to investigate their applicability, and using the married, filing separate tax rates, those least beneficial to the petitioner.

(7) Taxing all of the income to both Joseph and Sally Conforte.

(8) Taxing all of the Starlight income both to Joseph and Sally Conforte and to Gloria Elliott, after being advised by Mr. Brown that the income was shared between Mrs. Elliott and petitioners.

(9) Allowing only one-half of the itemized deductions to each petitioner in the year 1976.

(10) Allowing only one-half of the tax paid with the joint returns to each petitioner.

(11) Failing adequately to investigate and ascertain known itemized deductions.

(12) Failing to attempt to ascertain or corroborate petitioners' taxable income by means of the net worth or any other method.

Respondent argues that the inconsistent positions taken in the two statutory notices were protective positions which he recognizes would in part be resolved in favor of one or the other petitioner, but only with the assistance of petitioners, or after litigation. Further, respondent concedes that certain errors do exist in the determination but argues that he has been forthright and fair about the errors and that errors in favor of

petitioners also occurred. Thus, respondent contends that his actions do not warrant a shifting of the burden of proof because the protective nature of the inconsistent positions negates any air of capriciousness and that the errors were not of sufficient magnitude to support a finding that the determination was excessive.[1]

Our discussion of the burden of proof with respect to the Starlight Ranch is set out in detail *infra*. For reasons hereinafter stated, we find that the determinations with respect to the general soundness of the statutory notice, and to that portion which relates to the Mustang Ranch, were not arbitrary and excessive.

Petitioners' argument that the statutory notices were arbitrary in essence asks the Court to look behind the notices of deficiency. This Court has recently restated the general rule that we will not honor such a request. *Llorente v. Commissioner*, 74 T.C. 260 (1980). The rare exception to the general rule, the unreported income case in which respondent rests without presenting any evidence, is not applicable to the instant case. *Jackson v. Commissioner*, 73 T.C. 394 (1979).

The rationale for the general rule is "that a trial before the Tax Court is a proceeding de novo; our determination of a petitioner's tax liability must be based on the merits of the case and not any previous record developed at the administrative level." *Jackson v. Commissioner, supra* at 400; *Greenberg's Express, Inc. v. Commissioner, supra* at 328.

Turning to the above list of alleged errors or arbitrariness, we note that items 1, 2, and 3 have been corrected either by stipulation or concession. Items 6 through 11 clearly represent protective positions by respondent. Further, item 6, which is discussed in detail *infra*, represents a genuine issue in light of the manner in which petitioners filed their income tax returns for the years in issue.

When petitioners will neither assist nor cooperate with respondent in attempting to ascertain their rights to claim certain expenses or deductions, then this Court will not hear an

---

[1]Excessiveness by itself is insufficient, "since this is the situation in many cases where the courts determine that the respondent is entitled to a deficiency in a lesser amount than that set forth in his deficiency notice. *Helvering v. Taylor*, 293 U.S. 507 (1935), used the words 'arbitrary' and 'excessive' conjunctively." *Llorente v. Commissioner*, 74 T.C. 260, 267 (1980), Judge Tannenwald concurring.

argument by petitioners that respondent acted arbitrarily in failing to estimate such unsubstantiated claims. The Internal Revenue Code and the self-assessment system place the responsibility of maintaining records and substantiating claimed deductions upon the taxpayer. Sec. 6001. Respondent is not required to make estimations of unsubstantiated expenses or to ferret out every possible itemized deduction without the assistance or cooperation of the taxpayer. Accordingly, we find that petitioners' allegations that respondent failed to investigate and estimate unsubstantiated expenses and to ascertain petitioners' itemized deductions is without merit. Finally, we note that respondent has conceded petitioners' right to take certain expenses which were overlooked at the time the notices of deficiency were mailed. Items 4, 5, and 12 do not support petitioners' contention.

Our decision *infra* makes adjustments to respondent's determination; however, those adjustments are based upon the merits of the case and not upon a finding that respondent's determination was arbitrary.

Petitioners argue that, once they have established that respondent's determinations are erroneous, the burden of proof shifts to respondent with respect to the entire deficiency or, alternatively, with respect to those items to which they have proven respondent is in error. In support of this position, petitioners rely on *Herbert v. Commissioner, supra,* and *Cohen v. Commissioner, supra.* In *Herbert,* the Ninth Circuit appeared to hold that, once petitioners have shown that respondent's determination is erroneous with respect to unreported income, the ultimate burden of proof or persuasion shifts to respondent. However, with respect to deduction cases, the Ninth Circuit has made it clear that "after satisfying the procedural burden of producing evidence to rebut the presumption in favor of the Commissioner, the taxpayer must still carry his ultimate burden of proof or persuasion." *Rockwell v. Commissioner,* 512 F.2d 882, 885 (9th Cir. 1975).

This case is appealable to the Ninth Circuit and to the extent that that Circuit applies a different rule with respect to the burden of proof in omission from gross income cases from the rule applied by this Court, we have bound ourselves to apply the rule of the Court of Appeals. *Golsen v. Commissioner,* 54 T.C. 742

(1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971). We do not believe that *Herbert* and *Cohen*[2] require a shifting of the ultimate burden of persuasion. In *Rockwell v. Commissioner, supra* at 886, the Ninth Circuit specifically left open the question of the rule to be applied in omission from gross income cases. However, the Circuit Court intimated that *Herbert,* and the other cases, do not shift the ultimate burden of persuasion but only forewarn respondent of the consequences should a petitioner present evidence that the deficiency is erroneous and "there is added to the record (whether from the Commissioner's or taxpayer's witnesses or documents) no contradictory evidence supporting the bare assessment." *Rockwell v. Commissioner, supra* at 886 n. 1. The court then added that *Caratan v. Commissioner,* 442 F.2d 606 (9th Cir. 1971), revg. 52 T.C. 960 (1969), supported this proposition. We believe the rule of the Ninth Circuit is expressed in note 1 of the *Rockwell* case. While possibly not identical, this approach is at least similar to the rule of this Court in that it recognizes a relaxation of the quantum of evidence necessary to establish nonreceipt. However, application of this rule is inappropriate in the instant case. Both parties have presented a substantial amount of substantive evidence in support of their respective positions. Thus we are not here dealing with a "bare assessment."

Petitioners' final contention with respect to shifting the burden of proof is that respondent is no longer relying on the trick sheet as the method for calculating gross receipts of the Mustang. If respondent is using a different method of projection, petitioners contend that the act would be "new matter," thereby shifting the burden of proof on this issue to respondent. Rule 142(a), Tax Court Rules of Practice and Procedure. We note that petitioners have not argued that they were surprised and substantially disadvantaged by respondent's attempt to establish the average number of girls and their average earnings at the Mustang during the years in issue. Such argument would have been bootless, as petitioners introduced similar evidence during their case in chief in an effort to disprove the accuracy of respondent's determination. Thus, having found that petitioners were not surprised and substantially disadvantaged, we turn to

[2]See also *Clark v. Commissioner,* 266 F.2d 698, 706 (9th Cir. 1959); *Niederkrome v. Commissioner,* 266 F.2d 238, 241 (9th Cir. 1958), cert. denied 359 U.S. 945 (1959).

the question of whether respondent is advancing a new reason in support of the deficiency or raising a "new matter." *Estate of Horvath v. Commissioner,* 59 T.C. 551, 555 (1973).

It is well settled that respondent's determination may be affirmed for reasons other than those assigned in his notice of deficiency. *Estate of Finder v. Commissioner,* 37 T.C. 411 (1961). Without attempting to define the term "new matter," we think it is clear in the instant case that respondent has presented the evidence in question as corroboratory of the correctness of the deficiency and not as a new theory different from, and inconsistent with, his earlier determination. *Tauber v. Commissioner,* 24 T.C. 179, 185 (1955). At trial, and in his briefs, respondent has maintained that the original determination with respect to the gross receipts of the Mustang is correct, that the manner in which it was determined was reasonable, and that the evidence presented at trial supported sustaining the determination. Accordingly, we find that evidence suggesting the Mustang's average number of girls and their average earnings during the years in issue is not new matter and therefore the burden of proof has not shifted on this issue.

We note that, in the absence of books and records, any method used in determining the receipts of the Mustang will be, at best, inexact projections. This Court, based upon the evidence presented, has the responsibility to determine the correct amount of the deficiency, if any. Sec. 6514. Projections are only an aid in making that determination. In fulfilling our jurisdictional responsibilities, this Court may utilize the projections of respondent, petitioner, or make its own, based upon the merits of the case.

### *Mustang Ranch*

The next issue presented is whether petitioners failed to report income derived from the business activities carried on at the Mustang Ranch Brothel. Factual determinations required to resolve this issue include:

(1) Does the trick sheet represent income for a 12 or 24 hour period?

(2) What were the gross receipts for the years in issue?

(3) What is the proper deduction for payment to prostitutes for each year?

(4) What is the proper deduction for rent for each year?

(5) What amount of deduction should be allowed for such business expenses as groceries, repairs and maintenance, laundry, and other established business expenses?

(6) What is the proper deduction for utilities for the year 1973?

(7) What is the proper deduction for attorney's fees paid to Stanley Brown during 1976?

To determine petitioners' gross income from the Mustang, we must first determine their gross receipts for the years in issue.

With respect to this question, we note that all taxpayers are required to "keep such permanent books of account or records * * * as are sufficient to establish the amount of gross income, deductions, credits or other matters required to be shown," in any return of tax. Sec. 1.6001–1(a), Income Tax Regs.; see *Plisco v. United States*, 306 F.2d 784, 786–787 (D.C. Cir. 1962). Where a taxpayer keeps no books or records, or his records are inadequate, or where the taxpayer deliberately destroys his records, the respondent is authorized to compute income by whatever method will, in his opinion, clearly reflect the taxpayer's income. No particular method is required since the circumstances will vary in individual cases. *Harbin v. Commissioner*, 40 T.C. 373, 377 (1963); see also *Agnellino v. Commissioner*, 302 F.2d 797, 799 (3d Cir. 1962), affg. on this issue a Memorandum Opinion of this Court. Certainly, where the taxpayer has deliberately and willfully failed and refused to keep and maintain any books or records of his business transactions, or where the taxpayer has destroyed such records, the courts have not required mathematical exactness of the respondent in determining the taxpayer's income. *Harbin v. Commissioner, supra* at 377.

Indeed the courts have reacted flexibly in fashioning allowable methods of income reconstruction. Thus, they have permitted the respondent to reconstruct a taxpayer's income by computing the average daily gross gambling revenues received over periods as short as 1 day and then projecting such average daily gross gambling income over the entire period of gambling activity shown. See, e.g., *Gordon v. Commissioner*, 63 T.C. 51, 61 (1974), modified 63 T.C. 501 (1975), affd. per curiam 572 F.2d 193 (9th Cir. 1977) (1 day); *Fiorella v. Commissioner*, 361 F.2d 326 (5th Cir. 1966), affg. per curiam a Memorandum Opinion of this Court (2 days); *Gerardo v. Commissioner*, 552 F.2d 549, 551, 553 (3d Cir. 1977), affg. on this issue a Memorandum Opinion of this

Court (3 days); *Mitchell v. Commissioner*, 416 F.2d 101 (7th Cir. 1969), affg. a Memorandum Opinion of this Court (4 days). The rule was recently stated by the Third Circuit as follows: "Where unreported income from gambling is at issue, the projection of average daily gross receipts over a period of time in order to calculate gross income is an acceptable method of reconstruction." (*Gerardo v. Commissioner, supra* at 552 n. 6.)

The flexibility shown in gambling cases appears appropriate in the instant case. All books and records were either destroyed or unavailable as a result of petitioners' assertion of their Fifth Amendment privilege. The only independent document which evidences gross receipts as such is the trick sheet. Concededly, it was prepared at the Mustang Ranch and removed without petitioners' consent; nonetheless it represents actual receipts and not the projections of either party. However, the trick sheet is not without controversy. Respondent contends that it reflects the following: (1) A 12-hour night work shift, (2) for the winter of 1975, and (3) probably a weeknight. Petitioners, on the other hand, contend that it represents: (1) A 24-hour period, (2) during the summer of 1975, and (3) a weekend.

The stakes are clear, the record is filled with testimony that the Mustang's business was one of ups and downs, typical of the industry. Business was up during the summer and on the weekends, with downs occurring on weekdays and during the winter. The testimony spoke only of a two-season year, and the terms winter and summer were never clearly defined by either party. Petitioners, assuming the trick sheets represent a summer day, argue that any projection therefrom should reflect some form of seasonal adjustment. The greatest dispute among the parties, with respect to the trick sheet, is whether it represents a 12- or 24-hour period. Respondent, in making his determination, treated the sheet as representing a 12-hour night shift. To reflect the day shift receipts, he divided the night shift receipts in half. Then he added the night and day shift totals, and multiplied by 365 days to determine the annual receipts for the Mustang for each of the 4 years here in issue.

The history of the trick sheet is sordid. It was taken from the trash of the Mustang Ranch by Joe Peri. Mr. Peri worked at the Mustang when he was home on school breaks. One of his duties was to burn certain trash. It was from this trash that Mr. Peri took the trick sheet. He turned it over to his father's attorney

who, in turn, gave it to a Federal grand jury. Mr. Peri was uncertain with respect to the exact time of year he took the trick sheet. After reviewing his testimony before the grand jury and from the criminal employment tax trial of petitioners, Mr. Peri testified that his best recollection was that the trick sheet was taken during the 1975 Christmas season or Easter 1976; however, it may have been during the summer of 1975. If it were in the summer, it probably represents receipts from a Sunday, Monday, or Tuesday because he usually worked the first 3 weekdays, and the sheet, we assume, would represent receipts for the previous day's business.

Ascertaining with certainty whether the trick sheet represents a 12- or 24-hour period is impossible. Neva Tate, the trick sheet preparer, testified that it represented a 24-hour period. However, on three previous occasions, twice before the grand jury and at petitioners' criminal employment tax trial, Ms. Tate testified that it represented a 12-hour shift. Petitioners contend that Ms. Tate's answers before the grand jury reflected the accounting method used in August 1976, the month in which she was testifying, and not the 1975 method evidenced on the sheet in issue. Further, Ms. Tate testified that she was tired and upset at the time of her testimony before the grand jury. Finally, while unexplained by Ms. Tate, petitioners contend that because the criminal trial involved employment tax, not income tax, Ms. Tate's testimony on this point was not fully developed because it was totally irrelevant to the criminal case. The latter reason apparently represents the cause for petitioners' failure to cross examine Ms. Tate on this point at the first trial. Even though Ms. Tate's testimony lacked sufficient candor and consistency upon which we could find her a totally credible witness, we do accept her testimony on this point. Further, all other witnesses with knowledge of the accounting systems of the Mustang testified that the sheet represented a 24-hour period. We recognize that the testimony of Ms. Tate and Ms. Lynn, and that of Ms. Ash, petitioner Sally Conforte's sister, may have been prejudiced by their continued employment at the Mustang and personal friendships with petitioners. We did not find their testimony truthful for the most part, but on this point we are inclined to so find. Further, former cashiers at the Mustang who are unrelated to petitioners also testified that they believed the sheet to represent a 24-hour period. Accordingly, we find that

petitioners, by a preponderance of the evidence, have established that the trick sheet represented a 24-hour period.

This finding is based upon the following findings of fact:

(1) That Mr. Peri obtained the sheet during either the Christmas or Easter holiday.

(2) That 38 women working at the Mustang at that time of the year would probably represent the entire number of women at the Mustang. (See *infra* our discussion of the average number of prostitutes per day at the Mustang.)

(3) That a 12-hour report would not list all the women at the Mustang.

(4) That some of the women did not have earnings listed supports, we believe, a finding that the sheet represents a full report to petitioners of the earnings of all the prostitutes in the house.

(5) Treating the slip of paper representing petitioner Joseph Conforte's withdrawal separately as opposed to cash also indicates that the sheet did not represent a shift change but a closing of a full day's books.

Our finding that the trick sheet represents a 24-hour period is not without reservation. Respondent's brief on this point is well written. Ms. Ash's previous testimony that the receipts shown represented a slow day, combined with our finding that it represents a winter day and a 24-hour period, further convinces us that our determination is very conservative. We have already indicated our approval of respondent's method of reconstructing the Mustang's gross receipts. The only error determined is respondent's treatment of the trick sheet as representing 12 hours instead of 24.

Petitioners have asked the Court to base its determination, with respect to the Mustang, on the average number of women working per day times their average daily earnings as determined by testimony of the prostitutes and employees of the Mustang. Respondent contends that, if the average number of prostitutes is used in making the determination, then respondent's analysis of Dr. Nelson's records and the State health records best evidence that number. This analysis shows the average number of prostitutes working at the Mustang during the years at issue to be as follows:

| Year | Number | Year | Number |
|------|--------|------|--------|
| 1973 | 41.47 | 1975 | 38.32 |
| 1974 | 41.12 | 1976 | 41.30 |

While respondent has attempted to maximize the accuracy of the above figures, potential errors exist. Only partial-year figures were available with respect to 1973 and 1974. Dr. Nelson's records were not available for 1975 so that year's analysis is based entirely on State records. Notwithstanding those factors which make for potential inaccuracies, this analysis does substantiate the use of 38 prostitutes, the number on the trick sheet, as a reasonable approximation of the average daily number of women working at the Mustang.

With respect to average daily earnings per prostitute, the testimony is extremely varied. Predictably enough, most of the prostitutes' testimony was less than candid and generally their answers were evasive. Since we are convinced that the number of women shown on the trick sheet represents a reasonably accurate estimation, it is appropriate to refer to the gross receipts figure thereon in reconstructing gross receipts for all the years in issue. In short, we are satisfied that the trick sheet does not evidence an abnormally high number of prostitutes, and we are not prepared to accept the testimony of higher average daily earnings by respondent's witnesses or lower average daily earning by petitioners' witnesses. Neither party has convinced us that the receipts shown on the trick sheet are anything other than an average day's receipts. Further, in light of our finding that it most likely was taken by Mr. Peri on either a Monday, Tuesday, or Wednesday, we are convinced that it is probably a weekday's receipts and not a weekend day when business was up. Furthermore, the thrust of the prostitute witnesses tends to support the trick sheet figures as being roughly typical of their average day's earnings.

We find that the gross receipts and gross income of the Mustang should be determined by multiplying the gross receipts shown on the trick sheet ($4,961) times the number of days in the year for each of the years here at issue.

### Expenses

Petitioners are entitled to deduct from the gross income figure all ordinary and necessary business expenditures paid

during the years. Sec. 162(a). The parties have stipulated that the receipts were divided as follows:

The amount realized as a result of each prostitute's activities during a shift is split evenly between the prostitute and the house. From the prostitute's share is deducted an amount, up to $10.00, which represents ten percent of her earnings. This latter amount also goes to the house. In the event the prostitute's share is less than $50.00 per shift, there is no ten percent deduction. In the event a prostitute's share is more than $100.00, only $10.00 is deducted by the house.

Applying the above formula to the receipts of each prostitute as shown on the trick sheet, we determine that the prostitutes netted, and petitioners are entitled to deduct, $843,935 per year for each year in issue. Petitioners contend that if the Court finds that the trick sheet represents a 24-hour period and then uses the receipts figure to extrapolate gross receipts, it should use expenses shown on the trick sheet to extrapolate all the expenses of the Mustang. Put differently, they argue that the expense figure and gross receipt figure are of equal dignity. This argument has superficial appeal, but does not withstand analysis.

The prostitutes were paid on the day succeeding the day they worked. Thus, the expense figure shown on the trick sheet represents mostly at least, the previous day's earnings of the prostitutes. Further, there is no substantiation, or breakdown of the nature, of the alleged expenses.

Respondent allowed deductions for rent, salaries, utilities, groceries, taxes, and licenses for all the years in issue. In addition, he allowed deductions for bank charges and payroll taxes for calendar year 1976. This approach is far more accurate, and thus more reasonable, than that proposed by petitioners.

The burden to prove that respondent underestimated or omitted expenses to which petitioners were properly entitled is on the petitioners. Rule 142, Tax Court Rules of Practice and Procedure. Except to the extent modified below (or stipulated to by the parties) we find that petitioners have failed to carry this burden.

With respect to the utilities expenses, respondent allowed only 1 month's utilities for the year 1973. Petitioners contend, and we find, that they are entitled to a utilities' deduction of $6,082 for 1973. Respondent does not contest this adjustment.

Petitioners contend that respondent's groceries expense of

$150 per day is inadequate. They argue that groceries were closer to $200 per day; meat, $800 per week;[3] and dairy products, $300 per week; and that these figures more accurately reflect the true grocery expenses of the Mustang. The errand boy who picked up the groceries, Mr. James Peri, testified at the criminal trial that the average bill was $100 to $150. It was this testimony upon which respondent based his determination. The accuracy of this testimony is corroborated by Ms. Crisp, the cook at the Mustang. She testified that meals were prepared twice a day, breakfast and dinner, and that the errand boy picked up the needed supplies daily. Petitioners, on the other hand, rely primarily on the testimony of Ms. Lynn, the manager of the Mustang, to substantiate the existence and claimed amount of expenses. We did not find Ms. Lynn a credible witness. Accordingly, we are not prepared to make any finding of fact from her testimony. We note that she testified that groceries, excluding meat and dairy products, could run "as high as" $150 to $200 per day. Her testimony with respect to the weekly cost of meat was couched in equally uncertain terms—"I could say meat could be $400." Further, Ms. Crisp testified that meat was not delivered but instead picked up by the errand boy. Mr. Peri worked at the Mustang off and on during 1971–76 and had occasion to work each season of the year. Thus, it seems appropriate for us to conclude that his "average" grocery estimate represents the best estimate available. The fact that respondent used the high side of Mr. Peri's estimate for each day of the year further convinces us that the amount allowed is reasonable.

On the other hand, petitioners have failed to offer any other evidence on this point. They have not shown by a preponderance of the evidence that respondent's determination was erroneous. Accordingly, we sustain respondent's determination with respect to the grocery expenses and find included therein the cost of meat and dairy products.

Petitioners also contend that respondent erroneously and arbitrarily failed to allow them a deduction for laundry supplies, cleaning supplies, paper goods, laundry cleaning expenses, and daily repairs.

---

[3]We note that the Mustang observed the religious dietary laws by serving fish on Fridays.

The only evidence introduced with respect to laundry being sent out was the testimony of Ms. Lynn. We repeat that we will not make a finding of fact from her testimony. Petitioners, realizing the lack of substantiation with respect to this expense, ask the Court to apply a "Cohan" approach since the existence of the expense is known, but the amount is uncertain. See *Cohan v. Commissioner*, 39 F.2d 540, 544 (2d Cir. 1930). There was truthful testimony that the Mustang did the laundry of the prostitutes at a fee of $1 per article (e.g., $2 for a pair of socks). Thus, while respondent did not make allowances for these expenses, we are not convinced, from the evidence presented, that the expenses were not offset by the income derived from charging the prostitutes for laundry service or that the laundry was actually sent out to a cleaner.

With respect to the Petrolane, sheets, and paper goods expenses, petitioners have again failed to present any evidence upon which the Court can establish the existence of the expense or make an estimation of the amount. The burden of proving the existence of an expense and the amount thereof is on petitioners. They could have satisfied this burden by a number of different methods.

There is a probability that such expenses were incurred. However, when petitioners fail even to try to substantiate the existence or amount of the claimed deduction, such as in this case, then they fail to carry their burden of proof. Accordingly, we must sustain respondent's determination with respect to these items. We cannot help but point out that the uncertainty as to these items is of petitioners' own making and not that of respondent or this Court. Under this circumstance, we find no justification for allowing deductions for these items and would not feel comfortable in applying *Cohan v. Commissioner, supra.*

Petitioners argue that they paid a rental expense of $6,000 a month. Respondent, based on the testimony of the landlords at the employment trial, allowed a rental expense deduction of $500 a month. At the trial of the instant case, the landlords affirmed their testimony of the prior trial. According to the landlords, they were paid $500 a month for years 1968 through 1977, with an increase in 1978 to $1,000, and in 1979 to $6,000 per month. Records of the payments do not exist because petitioners always paid the rent in cash. Petitioners entered into the record tapes of conversations between Mr. Conforte and the landlords

which sufficiently impeached the landlords' testimony to prevent making a finding therefrom. In fact, the landlords' testimony was unreasonable, which was consistent with their demeanor and inappropriate attitude on the stand. They contend that for 9 years the rent went unchanged but that in 2 years it was increased 1,200 percent by reason of inflation. We believe that the increase was due to change in method of payment in 1979 from cash to check. Logic dictates this result. During most of the years in issue, petitioners were dependent upon the landlords for a location upon which to operate the Mustang. In late 1976, petitioners had completed building the new Mustang. To believe that petitioners paid only $500 a month, when they were totally dependent upon the landlords, and $6,000 a month, subsequent to the opening of the new Mustang, is unrealistic. We conclude, based upon the record presented, that petitioners paid $6,000 a month rent during all years here in issue.

### Legal Fees

Petitioners paid $57,149 in legal fees to Stanley Brown during 1976. Petitioners contend that they are entitled to deduct 80 percent ($45,719.20) of that amount as a business expense of the Mustang Ranch, or under section 212(3), as tax advice. Respondent contends that the testimony by Mr. Brown was too general to permit allocation of the fees to deductible legal services.

In *United States v. Gilmore*, 372 U.S. 39, 49 (1963), the Supreme Court held that the deductibility of legal expenses is determined by the "origin" and character of the claim with respect to which an expense was incurred, rather than its potential consequences upon the fortunes of the taxpayers. Mr. Brown stated that the 80-percent figure represented legal work related to a Washoe County grand jury report issued March 1976, a Federal grand jury investigation, litigation involving an ejectment action brought by the landlords of the Mustang, and a railroad crossing accident near Mustang.

According to Mr. Brown's testimony, the Washoe County grand jury work accounted for the largest portion of the fees. That grand jury reportedly "criticized certain public officials for dealing with Mr. Conforte—allegedly dealing with Mr. Conforte. They criticized his influence in the community." Mr. Brown's efforts were in an attempt to prevent the publication of the report.

The Federal grand jury investigated income tax evasion, withholding tax violations, firearms violations, immigration violations, obstruction of justice, and possibly murder. An indictment for withholding tax violations resulted from that investigation.

Based upon a thorough review of Mr. Brown's testimony, we further allocated the 80-percent figure as follows:

Washoe County grand jury .............. $32,003.44   70%
Federal grand jury ............................ 6,857.88   15%
Litigation ........................................ 6,857.88   15%

Respondent concedes that the litigation involving the railroad crossing accident and the ejection action directly related to the operation of the Mustang. Accordingly, we conclude it is deductible as an ordinary and necessary business expense under section 162. We find that one-half of the fees allocated above to the Federal grand jury investigation involved operation of the Mustang and are deductible under section 162. With respect to the Washoe County grand jury report, we find that its origin was personal in nature. The Mustang Ranch, as stated earlier in our findings of fact, is located in Storey County, not Washoe County. While Mr. Conforte's reputation and influence in Washoe County may have resulted from his ownership of the Mustang, we will not infer that the investigation involved the actual operation of the Mustang. A negative grand jury report might, as a practical matter, have damaging consequences to Mr. Conforte's operation of the ranch, but that is not a sufficient ground for deducting the legal expenses. See *Nadiak v. Commissioner*, 356 F.2d 911, 912 (2d Cir. 1966), affg. a Memorandum Opinion of this Court.

### Starlight Ranch

Miko was a prostitute at the Starlight Ranch during part of the years here in issue. Prior to her deportation, she was interviewed by the IRS and the Immigration and Nationalization Service on two separate occasions. Among other things, Miko stated she earned $20,000 a year as a prostitute at the Starlight. Respondent, utilizing the State health records, then determined the average number of prostitutes working at the Starlight. Respondent projected the Starlight's gross receipts by utilizing Miko's statement of her earning ability as an average

and applying that to the average number of prostitutes working at the Starlight. Petitioners, relying on the Court's exclusion from evidence of the statements of Miko, argue that respondent's determination concerning the Starlight is arbitrary and capricious as a matter of law. Thus petitioners argue that the burden of proof is on respondent.

The fact that Miko's statements were not admitted into evidence does not automatically make respondent's determination arbitrary. Respondent's determination may rest in part upon inadmissible evidence. *Greenberg's Express, Inc. v. Commissioner, supra.* However, after a careful review of the testimony of prostitutes who worked at the Starlight and the Internal Revenue agent who interviewed Miko, we find that she was indeed an above average earner. Therefore, the projection based upon her earning ability times the average number of prostitutes at the Starlight is erroneous.

Were there no other evidence with respect to the Starlight, we might be in the position contemplated in *Herbert* and *Cohan:* evidence that respondent's determination of unreported income is erroneous and a void of evidence upon which to determine the correct deficiency, if any (see page 1179 *supra*). In this situation, petitioners would have effectively carried their burden of proof.

However, we have no such void of evidence. Mrs. Elliott, the manager of the Starlight during the years in issue, testified, as did prostitutes who worked at both the Mustang and the Starlight. Unfortunately, the amount and probative value of the evidence presented with respect to the Starlight is relatively minimal in comparison with the voluminous evidence concerning the Mustang. In addition, the testimony of Mrs. Elliott was self-serving because she shared in the profits and has her own case pending before this Court. Nonetheless, a thorough review of the record and evidence convinces us that a determination on the merits can be reached.

We start out by noting that respondent's determination was based upon two factors: (1) The average number of prostitutes, and (2) a presumption that Miko's earnings represented what each of those prostitutes could earn.

Respondent determined the average number of prostitutes working at the Starlight by reviewing the State medical records of examinations given at the Starlight. The agent preparing the determination, upon which the deficiency was based, had figures

for 1973 through 1975, showing an average number of between 13 and 18 women during those years. Since respondent did not have any figures for 1976, he "rolled over" the 1975 figure and used it for the next year's average.

During trial, respondent placed into evidence an exhibit which summarized the medical examination slips which had been submitted by Dr. White, the Starlight's regular physician. After comparing the State records with Dr. White's records respondent determined, in this trial exhibit, that the average number of prostitutes working at the Starlight on a daily basis was as follows:

| Year | Number |
|------|--------|
| 1974 | 14.3 |
| 1975 | 17.1 |
| 1976 | 15.4 |

To reach this figure, prostitutes who were examined twice during a week were eliminated. However, a weighted averaging method was used which presumed that each prostitute worked the entire week. Further, women who may have been examined on their way out of the Starlight would also be included. On the other hand, women who worked at the Starlight but were examined by a doctor other than Dr. White—and this did occur occasionally—would not be included in the above average.

Again, we are faced with potential error on both the high and low sides. After thoroughly reviewing the testimony of the prostitutes and Dr. White, and our own review of the exhibits, we find that the above average should be reduced by three women per day. Accordingly, we find the average daily number of prostitutes working at the Starlight to be as follows:

| Year | Number |
|------|--------|
| 1974 | 11.3 |
| 1975 | 14.1 |
| 1976 | 12.4 |

We believe the above figures more accurately take into account the time when women were checked on their way out, did not work the entire week, or were unable to work because of illness, contrasted with the number of times women were examined by someone other than Dr. White.

With respect to the year 1973, petitioners failed to present any

evidence that the average number of women working at the Starlight was not 13 as determined by respondent. Furthermore, this number is consistent with the number of prostitutes we have just found for the other years in issue. Petitioners have given us no reason to refuse to accept respondent's determination on this point; they have not carried their burden.

The next part of the question presented is the average earning per prostitute per year. The average prostitute grossed $130.55 per day at the Mustang. According to the testimony of Ms. Moore, a woman who worked at both brothels, she could earn only one-half as much at the Starlight as compared to the Mustang. It is true that, unlike the Mustang, there were other brothels within the immediate vicinity of the Starlight. Further, it can reasonably be inferred from the record that the Starlight was not as well publicized or known throughout the area as the Mustang. Accordingly, we find that the average prostitute at the Starlight grossed approximately $75 per day. Based upon our analysis of the Mustang, we know that the management received approximately 53.4 percent of the gross amount.[4]

There was also evidence that the Starlight had gross income from the sale of liquor and T-shirts. However, due to the total lack of evidence concerning the amount of income, we make no finding that these sales resulted in a gross profit and net taxable income to petitioners. Notwithstanding our reluctance to make such a finding, the existence of these sales indicated to us that our above finding of gross receipts and income is a conservative determination.

With respect to the expense of the Starlight, the record is void of credible testimony.[5] The burden of proving these expenses was upon petitioners. The testimony presented on this point by petitioners was by Mrs. Elliott and her accountant, Mr. Craw-

---

[4]Thus, by way of example, gross receipts and the prostitute's share would be determined as follows:

$$\text{Average number of prostitutes per day} \times \text{Average gross receipts per prostitute per year} = \text{Gross receipts}$$

$$\text{Gross receipts} \times 53.4 = \text{Gross income of Starlight}$$

[5]For example, we have had to sustain respondent's objection to the introduction of the Starlight's 1978 expense records. Consequently, we have not used that exhibit in reaching our determination.

ford. The Court said at trial it would not make a finding of fact for either party from Mr. Crawford's testimony.[6] The same is true with respect to Mrs. Elliott's testimony. Accordingly, in the absence of any evidence to the contrary, we sustain respondent's determination with respect to the expenses of the Starlight, except as otherwise changed by either stipulation or agreement of the parties.

———

We next consider those issues which relate to petitioners, directly, as opposed to businesses in which they shared an ownership interest. These issues include: (1) Whether the Form 1040 filed by petitioners constitutes a viable return for all purposes; (2) whether petitioners are entitled to the benefits of section 1348 (i.e., the maximum tax provision); (3) whether petitioners are entitled to deductions in 1974–76 under section 616, or alternatively, as a charitable contribution in 1976; (4) whether petitioners are liable for the addition to tax under section 6653(b) for fraudulent underpayment; and (5) whether the statute of limitations bars assessment for calendar year 1973.

During the years 1973 through 1976, petitioners jointly executed a Form 1040 U.S. Individual Income Tax Return. Each contained only the taxpayers' names, address, social security numbers, filing status, exemptions, an amount designated as taxable income, and computations of income and self-employment tax. Attached to each Form 1040 was a statement which set forth petitioners' belief that Mr. Conforte was under criminal investigation and that detailed information would be used against him in a criminal proceeding.[7] Petitioners contend

———

[6]Mr. Crawford admitted that Mrs. Elliott never brought in complete expense records and that he never asked for them; he just accepted her word on what her taxable income had been.

[7]The pertinent part of the statement was, generally, as follows:

"Although I would like to file a complete and detailed return, I am truly concerned that any details of my income and expense would be used against me in any criminal proceedings which the Internal Revenue Service and the Department of Justice contemplate. I therefore respectfully declare that any information for which space is contained on Form 1040, the attached Individual Income Tax Return, for my wife and myself, and which is not filled in, might lead to or uncover information which might tend to, or actually will incriminate me under either State or Federal law. *U.S.* v. *Sullivan*, 274 U.S. 259 (1927); *Marchetti* v. *U.S.*, 390 U.S. 39 (1968); *Haynes* v. *U.S.*, 390 U.S. 85 (1968)."

that under the circumstances of this case, they were justified in filing the Form 1040 as they did and that it constitutes a valid return for all purposes.

It is well settled that a taxpayer's obligation to file a return does not violate his Fifth Amendment privilege against self-incrimination. *United States v. Sullivan*, 274 U.S. 259 (1927). On the other hand, any disclosure on the return represents a waiver of the taxpayer's privilege with respect to the information disclosed. *Garner v. United States*, 424 U.S. 648 (1976).

This Court has long held that a Form 1040 filed within the allocated time will not qualify as "a return" when it does not state specifically the amounts of gross income and the deductions and credits claimed. *Sanders v. Commissioner*, 21 T.C. 1012, 1018 (1954), affd. 225 F.2d 629 (10th Cir. 1955).

We recognize that requiring a taxpayer to claim the privilege at the time he files his Form 1040 and our rule of specificity with respect to the amount of gross income and deductions claimed can potentially conflict. However, the Fifth Amendment claim should relate to the source of the income and not the amount, for even income obtained by illegal means must be reported. See *James v. United States*, 366 U.S. 213 (1961). Further, a taxpayer should exercise the privilege on an item-by-item basis so that the propriety of the claim could be tested properly. *Heligman v. United States*, 407 F.2d 448, 450–451 (8th Cir. 1969).

Petitioners contend that detailed disclosure on a return "could furnish leads relating to sources of income for earlier years under criminal investigation; disclosure of dividends and interest lead to evidence of net worth increases; disclosure on depreciation schedule and Schedule D show acquisition dates and cost of assets for net worth purposes." The point of petitioners' contention appears to be that the Fifth Amendment privilege can be claimed on the tax return as a defense for past violations of income tax laws. This position is clearly erroneous. In *Garner*, the Supreme Court expressly limited its decision to "only those [claims of privilege] justified by a fear of self-incrimination *other than under the tax laws.*" (Emphasis added.) *Garner v. United States, supra* at 650 n. 3. Thus, a taxpayer cannot use the privilege to further efforts to evade payment of taxes. Stated differently, but traditionally, a taxpayer may not use the privilege as a sword instead of the shield for which it was

intended. *United States v. Carlson*, 617 F.2d 518 (9th Cir. 1980); *United States v. Schmitz*, 525 F.2d 793, 795 (9th Cir. 1975).

The exercise of the privilege with respect to nontax matters requires weighing the taxpayer's claim to constitutional protection against the need for public revenue collection which by necessity must rely upon self-assessment. See *California v. Byers*, 402 U.S. 424, 427 (1971). Where the taxpayer makes a blanket refusal to answer any question on the return, the submitted Form 1040 is not a return. See *United States v. Daly*, 481 F.2d 28, 30 (8th Cir. 1973). In such situation, respondent is without sufficient information to detemine whether petitioners' self-assessment has been properly determined.

In the case before us, petitioners' Form 1040 mirrors that of a blanket refusal. Neither a gross income figure nor the amount of deductions claimed appear on the Form 1040. The Form 1040 filed by petitioners does not provide sufficient information to permit computation and assessment. Effectively, petitioners' returns only state tax owed; by looking at the amount of tax paid respondent could have determined most of the other information provided, except for petitioners' names and social security numbers. To provide any less information would have been a violation of a criminal statute. See sec. 7203. Nor did petitioners attempt to make an item-by-item assertion of the privilege. They claimed any further information, required either in the Form 1040 or the schedules required to be attached thereto, was privileged. Balancing petitioners' right against self-incrimination and the respondent's right and need for the information, we conclude that the requirement that they provide such information is not a violation of their Fifth Amendment privilege.

We do not believe that the recent decision of the Ninth Circuit, to which any appeal in this case lies, in *United States v. Long*, 618 F.2d 74 (9th Cir. 1980), requires a different result under our rule established in *Golsen v. Commissioner*, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971).[8] In the *Long* case, the taxpayer at least made a pretense of filling out his return by answering the spaces provided with respect to income (i.e., "Gross Income," "Adjusted

---

[8] Cf. *United States v. Smith*, 618 F.2d 280 (5th Cir. 1980).

Gross Income," and "Taxable Income") with a zero. It can be argued that a zero is a numeral and accordingly an amount was given where required by the Form 1040, an amount that can be challenged. Here, petitioners made no efforts to respond to the demands for information concerning gross income and adjusted gross income. The essential information upon which verification of the petitioners' calculation of tax owed would be based. Thus petitioners gave no information that would permit any sort of audit.

It follows from our foregoing discussion that we find the Forms 1040 filed in each of the years in issue do not qualify as returns.

The next issue presented is whether petitioners are entitled to the benefits of section 1348. That provision provides for a 50-percent maximum tax rate on earned income.

To be entitled to the benefits of section 1348, a married individual must file a joint tax return for the taxable year. Sec. 1348(c). We have already found that petitioners did not file a return for the years in issue. See *supra*. Accordingly, we find that petitioners may not elect the section 1348 maximum tax provisions.

The next issue is whether petitioners are entitled to deductions in 1974–76 for the cost of the road, bridge, and underpass (road) under section 616 as a "development expenditure."

Section 616 provides that there shall be allowed as a current deduction in computing taxable income "all expenditures paid or incurred during the taxable year for the development of a mine or other natural deposit * * * if paid or incurred after the existence of ores or minerals in commercially marketable quantities have been disclosed." Sec. 616(a). However, section 616(a) specifically excludes from its coverage "expenditures for the acquisition or improvement of property of a character which is subject to the allowance for depreciation provided in section 167."

The burden of proving that the expenditures were for the development of the sand deposit and were incurred after commercially marketable quantities of the sand had been discovered is on petitioners. *Santa Fe Pacific R.R. Co. v. United States*, 378 F.2d 72, 75 (7th Cir. 1967). In the case before us, petitioners have failed to prove either fact. With respect to this

issue, the only testimony is that of Mr. Brown, petitioners' counsel.

Mr. Brown testified that the sand deposit was a very fine quality of sand and that it had added value because it was only a short distance from Reno. However, when asked whether Parco, the corporation formed to market the sand, had any income, he responded in the negative. He then qualified his answer by stating his belief that Mr. Conforte had received $700 from the sale of sand in 1976.[9] Such testimony falls far short of that necessary to prove the marketable nature of the sand deposit.

With respect to the purpose of the road, Mr. Brown inferred, but did not specifically state, that the reason for building the road was to allow development of the sand deposit. The exhibit indicates that that was a purpose. However, the facts muddy this evidence because the road provides one of only two means of reaching the new Mustang. The other route was over the property of the Peri brothers, with whom, we surmise, it would be difficult to have a stable and friendly relationship. By building the road, petitioners were able to remove their reliance upon the Peris for both location of the old Mustang and access to the new Mustang. Thus, it appears that one of the purposes for building the road was to protect the continued operation of the Mustang. Petitioners have not attempted to allocate between the different purposes. Thus, while we do not find that the sole reason for building the road was to facilitate the building of the new Mustang, we do find petitioners have failed to establish by a preponderance of the evidence that the purpose was for "development" within the meaning of section 616.

Finally, we note that petitioners have failed to establish that the road is not depreciable. Petitioners concede the road has a useful life independent of the sand deposit. The logical conclusion from this fact would be that it is depreciable. Cf. *Amherst Coal Co. v. United States*, 295 F. Supp. 421 (S.D. W. Va. 1969), affg. an unreported District Court decision. Being a depreciable asset of either venture (Parco or Mustang) would preclude current deductibility of the expenditure under section 616.

Petitioners contend that they are entitled to a charitable

---

[9]Q.   Did Parco have any income?
A.   No. Mr. Conforte, I think, received—from the sale of sand in 1976, about $700.

contribution deduction under section 170 by reason of their dedication of the roadway easement to Storey County.

After purchasing the north parcel, constructing the bridge over the Truckee River, depositing funds with Southern Pacific for the purpose of constructing the underpass, petitioners caused Parco to grant them a roadway easement over those portions of the ranch and north parcel covered by the road. Immediately thereafter, they dedicated the easement to Storey County, retaining a reversion should the dedicated easement ever cease being used as a public roadway. The dedication was accepted by the County in March of 1976.

Respondent contends that, as a factual matter, Storey County did not acquire its right to the bridge or underpass by reason of the petitioners' dedication. With respect to the underpass, we agree with respondent. Storey County acquired its rights in the underpass directly from the Southern Pacific Railroad. Further, the right to the land on which the underpass was constructed was clearly excepted in the original deed from Southern Pacific to Parco. Because Parco did not own the right-of-way, petitioners could not have owned it either, since they acquired their interest from Parco. With respect to the bridge, respondent contends that the roadway easement terminated at the Truckee River and therefore did not include the bridge. The resolution of acceptance of dedication clearly indicates petitioners dedicated roadways over two parcels in both Storey and Washoe Counties. While the exhibits may conflict on this point, we think it is clear, and find, based on Mr. Brown's testimony and the resolution, that petitioners dedicated both the bridge and the roadway.

Respondent, relying on *Taynton v. United States*, an unreported case (E.D. Va. 1960, 5 AFTR 2d 1466, 60–1 USTC par. 9458), and *Minzer v. United States*, an unreported case (N.D. Tex. 1969, 35 AFTR 2d 75–1416), contends that petitioners' contribution of the roadway does not qualify as a charitable contribution because petitioners were the "chief economic beneficiaries of the roadway." Petitioners contend that they did not receive any economic benefits from the dedication, other than a possible tax deduction. Further, they claim they opened access to the public out of true "disinterested generosity."

It cannot be gainsaid that petitioners were the chief economic beneficiaries of the roadway. By constructing the roadway, petitioners were able to avoid a $65,000 forfeiture to Mr. Parker

for failing to arrange access to the sand deposit. Further, petitioners were able to insure continued access to the new Mustang without having to rely on use of the Peris' property. Finally, we assume that this new accessibility enhanced the fair market value of petitioners' property.

Petitioners contend that this case is controlled by *Collman v. Commissioner*, 511 F.2d 1263 (9th Cir. 1975), revg. a Memorandum Opinion of this Court. In *Collman*, the Court of Appeals held that the trial court erred in finding that the taxpayer had made the dedication in exchange for a zoning change or some other direct economic benefit. *Collman v. Commissioner, supra* at 1269. In the case before us, petitioners clearly received economic benefit from the exception that the roadway be maintained as a public right of way. In this respect, the instant case more closely resembles *United States v. Transamerica Corp.*, 392 F.2d 522 (9th Cir. 1968), where the taxpayer conveyed a private roadway on the understanding that the city would improve and maintain it as a public street to the taxpayer's benefit. In that case, the court had no difficulty in finding that the taxpayer received a direct economic benefit. *United States v. Transamerica Corp., supra* at 524.

Even assuming petitioners were entitled to a charitable contribution deduction, the amount to which they would be entitled has not been established. We have found that petitioners did not dedicate the underpass. Thus, petitioners have dedicated only the bridge and a portion of the roadway. Petitioners contend that the actual cost of the bridge and roadway represents the fair market value of the contribution. We do not agree. As previously stated, petitioners, by making conditional the dedication, effectively retained an economic benefit in the roadway. We are not prepared to find that the fair market value of the right-of-way to the public in fact equals the cost of the underpass, bridge, and road.

Accordingly, we conclude that petitioners are not entitled to a charitable contribution deduction under section 170 for their dedication of the roadway.

### Fraud

The final issue presented is whether any of the underpayment of tax in 1973 through 1976 was due to fraud within the meaning of section 6653(b). Fraud is an actual intentional wrongdoing;

the intent required is the specific purpose to evade a tax believed to be owing. *McGee v. Commissioner*, 61 T.C. 249, 256 (1973), affd. 519 F.2d 1121 (5th Cir. 1975), cert. denied 424 U.S. 967 (1976). In order to prove an underpayment is due to fraud, respondent must prove, by clear and convincing evidence, that petitioner had the specific purpose and intent to evade tax. Sec. 7454(a); Rule 142(b), Tax Court Rules of Practice and Procedure. The existence of fraudulent underpayment can be established by circumstantial evidence and reasonable inferences drawn from the record. *Stoltzfus v. United States*, 398 F.2d 1002, 1005 (3d Cir. 1968). However, the mere suspicion of fraud is insufficient and it will not be imputed or presumed. *Carter v. Campbell*, 264 F.2d 930, 935 (5th Cir. 1959).

We have already established that petitioners underreported their income from the Mustang and Starlight. Therefore, the primary focus, with respect to the fraud issue, is whether the resultant underpayment of tax, or any part thereof, was due to intent by petitioners to evade tax.

Substantial discrepancies between petitioners' net income and reported income for 4 successive years strongly evidence an intent to defraud the Government. *Rogers v. Commissioner*, 111 F.2d 987, 989 (6th Cir. 1940). Petitioners correctly contend that, where the finding of a consistent underpayment is based upon petitioner's failure to overcome the presumptive correctness of a deficiency, that finding will not be regarded as proof of fraud. *George v. Commissioner*, 338 F.2d 221, 223 (1st Cir. 1964). However, as we stated earlier, our previous finding of underpayment was not based upon the procedural rules with respect to burden of proof, but upon the substantial amount of evidence before this Court. Put differently, we have found that there was substantial affirmative evidence of consistent underpayment of tax by petitioners.

A further indication of fraud is the destruction of records. *Spies v. United States*, 317 U.S. 492, 499 (1943). The evidence clearly establishes a pattern of burning papers at the Mustang. Specifically, the papers in the trash can next to the cashier were to be burned. Contrasting this practice was the general policy of placing trash in a pickup truck which was used to take trash to the Mustang dump. Notwithstanding the fact that papers other than the business records were occasionally destroyed and that the burning was done in a nonsecretive manner in clear view of

the public parking area, these actions evidence an intent to destroy or at least minimize the existence of any business records. Further, there is no evidence that any permanent accounting records were maintained with respect to either the Mustang or the Starlight. To the contrary, with respect to the Starlight, it is clear that contemporaneous records were not maintained nor did they exist at the time of trial. With respect to the records of the Mustang, Mr. Conforte has asserted his Fifth Amendment privilege. We have drawn no negative inference therefrom. However, the assertion of this constitutional right is no reason for us to ignore, as petitioners would have us do, the fact that the manager of the Mustang never saw any permanent records.

Petitioners operated almost exclusively in cash throughout the years in issue. The Mustang employees were paid daily in cash, and expenses of the Mustang were also paid in cash. This fact, alone, would not be significant. However, Mr. Conforte had been convicted of tax evasion in earlier years based upon a net worth analysis. One of the methods of preventing a net worth reconstruction of income is to operate solely in cash. We think it is proper to take into consideration a taxpayer's knowledge of the indirect effects of his actions in determining whether those acts were taken to avoid taxes.

Direct or clear-cut evidence of intent to evade taxes is seldom available. It is for this reason that we permit circumstantial evidence to be utilized to establish fraud. *Pigman v. Commissioner*, 31 T.C. 356, 370 (1958). Further, the question of whether petitioner had the requisite fraudulent intent is resolved from a consideration of the entire record.

In addition to consistent and substantial underpayments, lack of knowledge by anyone other than petitioner of the existence of any permanent business records, and the operating almost exclusively in cash, Mr. Conforte owned the property where the Starlight was located in the name of a nominee for approximately 6 years. A quitclaim deed from Mrs. Elliott (also known as Kitty Bono) to Mr. Conforte dated June 18, 1973, was not recorded until June 1, 1979. Prior to the quitclaim deed, Mrs. Elliott, on April 10, 1972, had received title to the Starlight property subject to a deed of trust. Also on April 10, 1972, Mr. Conforte was assigned the deed of trust. This assignment was not recorded until June 4, 1979. Thus, over a 6 or 7 year period,

Mr. Conforte was the actual owner of the Starlight property, while recorded title was in someone else's name.

Petitioners contend that, because their attorney advised respondent that they owned an interest in the Starlight, the fact that the property was in someone else's name should not be held against them. While petitioners' candor may militate in their favor, it does not make the fact that property was held in the name of a nominee, irrelevant. Petitioners' attorney apparently did not disclose the extent of petitioners' interest in the Starlight.

Consistent and substantial understatement of income, operating exclusively in cash, destruction of records, and holding of property in the name of a nominee are indicia of the requisite fraudulent intent. See *Spies v. United States, supra.* After an exhaustive review of the record we are convinced that the evidence clearly establishes petitioners' understatement of income was with intent to evade tax. Accordingly, we sustain respondent's addition to tax under section 6653(b).

Petitioners argue that, even if Mr. Conforte had the requisite intent, the evidence is insufficient to sustain the fraud penalty with respect to Mrs. Conforte. We do not agree. The evidence clearly establishes that Mrs. Conforte was knowledgeable with respect to operations of the Mustang and was there off and on during the years in issue. Dr. Nelson testified that he would occasionally examine Mrs. Conforte and have medication sent to her at the Mustang. Other witnesses testified that they were instructed by Mrs. Conforte to burn paper. Based upon the entire record, we are convinced that, at the time Mrs. Conforte signed the Form 1040, she knew that it understated income. Further, we find that, at the time Mrs. Conforte filed the Form 1040 for each of the years in issue, she understated income with intent to evade tax.

Petitioners contend that respondent incorrectly computed the addition to tax for fraudulent underpayment. Section 6653(b) provides that "if any part of any underpayment * * * is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment." The term underpayment is defined in section 6653(c), in so far as applicable here, as a deficiency as that term, in turn, is defined in section 6211.

Section 6211 defines deficiency, again as applicable here, as the amount by which the true tax due exceeds the sum of: (1)

The amount shown by the taxpayer as the tax due on his return *if* a return was made (sec. 6211(a)(1)(A)), and (2) amounts previously assessed (or collected without assessment) as a deficiency.(sec. 6211(a)(1)(B)).

Petitioners contend that the amount of tax shown on their Form 1040 qualifies as an "amount shown as the tax by the taxpayer upon his return" within the meaning of section 6211(a)(1)(A). Alternatively, petitioners contend that the amount of tax shown on their Form 1040 represents àn amount previously assessed (or collected without assessment) under section 6211(a)(1)(B). Respondent argues that the Form 1040 timely filed by petitioners does not constitute a return for the purpose of section 6211 and that the prior payment of taxes by petitioners was neither assessed nor collected without assessment as a deficiency within the meaning of section 6211(a)(1)(B). Therefore, respondent contends that the amount shown on the Form 1040 should not reduce the amount of the underpayment to which the so-called fraud penalty would apply.

We have noted that section 6211(a)(1)(A) reduces the amount of the deficiency by the amount shown on the return. The underpayment definition section, sec. 6653(c)(1), codified a pre–1954 Code judicial doctrine which required that the return be timely filed before the amount shown on the return would reduce the amount of the underpayment. See *Still, Inc. v. Commissioner*, 19 T.C. 1072, 1076–1077 (1953), affd. 218 F.2d 639 (2d Cir. 1955). However, as we found *supra*, the forms filed, though timely, did not constitute returns. Put in this light, petitioners' payments are similar to estimated tax payments which do not reduce the amount of the underpayment. *Tomlinson v. Lefkowitz*, 334 F.2d 262, 267 (5th Cir. 1964). Petitioners have failed to establish why a filed Form 1040, which does not constitute a return for purposes of section 1348, 6501, or other section, should be treated as a return for the purpose of section 6211 and section 6653(c). Further, sound judicial judgment, we believe, compels us to give the same word the same meaning throughout the Code whenever possible and in the absence of statutory direction to the contrary. Therefore, we find that a timely filed Form 1040 which does not constitute a return does not satisfy the requirements of section 6211(a)(1)(A).

We believe that petitioners' alternate contention, that the amount paid with the filing of the Form 1040, or subsequent

thereto, reduced the amount of the deficiency under section 6211(a)(1)(B), is also without merit. The amount shown by petitioners on their Form 1040 was assessed by respondent, but not as a deficiency as required by that section. Such assessment was impossible because respondent did not possess sufficient facts at the time of the payments to permit him to assert a deficiency. Finally, we note that this Court has held on prior occasion that the mere fact that respondent assessed payment made without a return does not reduce the amount of the underpayment for the purposes of section 6653(b). See *Stewart v. Commissioner*, 66 T.C. 54, 61 (1976). Accordingly, we sustain respondent's method of calculating the section 6653(b) addition to tax.

*Decisions will be entered under Rule 155.*