METRO LAND CO., INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Metro Land Co. v. Commissioner
Docket No. 3537-77.
United States Tax Court
T.C. Memo 1981-335; 1981 Tax Ct. Memo LEXIS 407; 42 T.C.M. (CCH) 263; T.C.M. (RIA) 81335; June 29, 1981
Searle E. Mitnick, for the petitioner. R. Dale Eggleston, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined deficiencies in petitioner's Federal income tax for its taxable years ending August 31, 1971 and August 31, 1972, in the respective amounts of $ 870.13 and $ 16,917.38. After concessions by petitioner, the only issue before us is whether petitioner may deduct, either as an ordinary and necessary business expense or as interest expense, certain payments made by it in its taxable years *408 ending August 31 of 1968, 1969, and 1970. [1]
FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Metro Land Co., Inc. (herein petitioner), is a corporation organized on August 9, 1967, under the laws of the State of Maryland. Its principal place of business when it filed the petition herein was Sykesville, Maryland. Petitioner filed Federal corporate income *409 tax returns for its taxable years ending August 31, 1966 through August 31, 1972. At all relevant times, S. William Ruff, Jr. (herein Ruff) owned 70 percent of the stock of petitioner and Mary T. Dokas (herein Dokas) owned 30 percent thereof. Petitioner's business at all relevant times was investing in and developing real estate. Ruff and Dockas were also the sole shareholders of three other corporations: Fieldstone Development Corporation, Westchester, Inc., and Highland Development, Inc. (herein sometimes referred to in the aggregate as "the construction corporations"). The construction corporations were formed prior to the organization of petitioner, but were, by May 7, 1968, defunct, inactive and unable to pay their debts. The Maryland Department of Assessments and Taxation, on December 30, 1968, annulled the corporate charters of each of the construction corporations. Petitioner purchased a tract of land containing 78.2934 acres (herein the Bonnie Brae property) on October 5, 1965. The land was purchased from Robert L. Fluhart for $ 146,899 and was the subject of a $ 116,889 purchase money mortgage which petitioner gave on that date to secure a portion of the purchase *410 price. Petitioner purchased the Bonnie Brae property with the intent of subdividing it and thereafter offering the lots for sale. On the same date, petitioner borrowed $ 50,000 from Herman Mednick and Sol Berenholtz (herein M & B). Such loan was secured by a mortgage on the Bonnie Brae property. During the time that petitioner was developing the Bonnie Brae property, it also acquired a 37.8955-acre tract of land in Baltimore County, Maryland (herein the 37-acre tract). This land was purchased on February 17, 1966, for $ 157,692.74 and was sold on July 18, 1967, for $ 195,100. The 37-acre tract had not been subdivided into lots prior to its sale by petitioner. On February 23, 1967, petitioner mortgaged the Bonnie Brae property to National Homes, Corporation, to secure an indebtedness of $ 80,000 owed to National Homes, Corporation, by the construction corporations. This mortgage was given to relieve Ruff and Dokas of their personal liability on such debt. On May 19, 1967, petitioner mortgaged the Bonnie Brae property to M & B to secure a loan of $ 26,459.75. On October 17, 1967, petitioner mortgaged the Bonnie Brae property to M & B to secure a loan of $ 7,956.65. On *411 October 31, 1967, petitioner mortgaged the Bonnie Brae property to M & B to secure a loan of $ 2,330.15. As of May 7, 1968, none of the hereinbefore mentioned mortgages had been released. Some time prior to May 7, 1968, M & B lent no less than $ 25,006.56 to the construction corporations. Ruff, but not Dockas, was personally liable for this debt. On May 7, 1968 (at which time the construction corporations were, to all intents and purposes, defunct and inactive), M & B lent $ 35,666.45 to petitioner. The loan agreement provided for interest at a rate of 7-1/2 percent per annum and the loan was secured by a mortgage on the Bonnie Brae property. As part of the loan agreement, petitioner executed a separate instrument which obligated the petitioner to satisfy the outstanding indebtedness of $ 25,006.56 owed M & B by the construction corporations. No services were rendered to petitioner in consideration of petitioner's agreeing to repay the sum of $ 25,006.56. During its fiscal years ended August 31 of 1968, 1969 and 1970, petitioner paid M & B $ 2,525.51, $ 19,702.00 and $ 2,779.05, respectively, in satisfaction of the $ 25,006.56 indebtedness owed by the construction corporations. *412 It is the treatment of these payments that is the subject of this controversy. Petitioner did not deduct these amounts as expenses on its Federal income tax returns for those three taxable years, but instead deducted the total amount paid on such indebtedness on its return for its taxable year ended August 31, 1972. [2]
Petitioner engaged in substantial, regular activity from and after the time it acquired the Bonnie Brae property, which it wanted to develop with 15,000-square-foot (1/3 acre) lots and a private sewage system. Petitioner began work on this plan immediately subsequent to the purchase of the Bonnie Brae property by advertising for the right to dump effluent and by engaging consulting engineers to work on the design of sewage treatment plants. At the same time, petitioner hired an engineer who did all the necessary work required for submission of subdivision plats to Carroll County (Maryland) authorities, which work involved the planning of water and sewer mains for a future system. The development of the Bonnie Brae property necessitated numerous meetings with authorities from the State Roads Commission, the Carroll County Commissioners, *413 and the Carroll County and State Health Departments. Due to the creation of a Freedom Sanitary District by the Carroll County Commissioners in the fall of 1966, petitioner's plan for 15,000-square-foot lots was not approved by the governmental authorities. As a result, in 1967 petitioner prepared and submitted an entirely new plan with one-half acre parcels and septic systems for each lot, which plan required new engineering surveys and new applications for governmental approval. Around May of 1968 petitioner faced a financial crisis concerning the development of the Bonnie Brae property. Petitioner needed about $ 35,000 to make a payment due on the purchase money indebtedness incurred in acquiring the Bonnie Brae property and to pay for the engineering and other costs incurred in the ongoing development of such property. Petitioner, Ruff and Dokas had extremely poor credit standings in the community at this time because of their relations to the defunct and insolvent construction corporations. Petitioner tried to borrow the necessary funds from M & B but was turned down. It informally approached other potential lenders, but its bad credit rating, along with the bad credit *414 ratings of Ruff and Dokas, caused such potential lenders to refuse to lend petitioner the needed funds. So, petitioner returned to M & B to obtain such funds, and the above-described loan agreement of May 7, 1968, was consummated. M & B would not have lent the needed funds to petitioner without its accompanying promise to pay off the outstanding debt of the construction corporations to M & B. There was another benefit to petitioner in getting its loan from M & B aside from merely obtaining the badly needed funds. This benefit was that, although institutional lenders would have required periodic interest and principal payments, M & B were satisfied to have their loan paid out of lot releases, i.e., as lots were sold, the proceeds would be used to satisfy the loans. Shortly after petitioner obtained this loan (and averted a financial crisis), it began selling subdivided lots from the Bonnie Brae property. On July 16, 1968, petitioner sold two lots. Another lot was sold on February 12, 1969. By August 31, 1969, seven lots had been sold. By December 31, 1972, at least 61 lots had been sold. All of the lots were sold by January 16, 1975. All in all, petitioner made a profit *415 on the Bonnie Brae development. Petitioner deducted as a "cost of financing" the $ 25,006.56 paid to M & B under the terms of the addendum to the May 7, 1968, loan. The Commissioner, in his statutory notice of deficiency, disallowed this deduction with the following statement: It is determined that the amounts claimed by you as cost of financing during the tax years ending August 31, 1971 and August 31, 1972, were overstated in the respective amounts of $ 1,900.00 and $ 25,006.56. No amount greater than the amounts as determined as shown below is allowable because it has not been established that any amount greater than those amounts represents an ordinary and necessary business expense or was expended for the purpose designated. Accordingly, your taxable income is increased as shown below. OPINION Petitioner purchased the Bonnie Brae property in 1965 and actively developed it from that time through 1975. In May of 1968, petitioner needed to borrow approximately $ 35,000 in order to avert a disastrous financial crisis. M & B agreed to lend petitioner the needed funds at 7-1/2 percent per annum. They also required, as a condition to making the loan, that petitioner agree *416 to pay off a $ 25,006.56 indebtedness owed to M & B by the defunct construction corporations. Ruff and Dokas, the shareholders of petitioner, were the controlling shareholders of the construction corporations. Ruff was personally liable on the $ 25,006.56 unpaid indebtedness. Petitioner obtained the loan under the above-described conditions, averted the financial crisis, and eventually turned a profit on the Bonnie Brae property. It paid off the $ 25,006.56 indebtedness and deducted such payments as "cost of financing." The Commissioner disallowed the deduction. The Commissioner, per the statutory notice of deficiency, disallowed the deduction of those payments for two reasons: (1) "because it has not been established that * * * those amounts [represented] an ordinary and necessary business expense," and (2) "because it has not been established that any amount * * * was expended for the purpose designated [cost of financing]." In other words, respondent denied the deduction under section 162, Internal Revenue Code of 1954, [3] because it was not ordinary and necessary, and under section 163 because it was not interest paid on indebtedness. Petitioner *417 contends that such payments were deductible under either or both of such sections. Respondent did not assert, either in his statutory notice of deficiency, his pleadings, at trial, or in his opening and answering briefs, that such payments constituted constructive dividends to Ruff, which characterizations would, of course, render the payments non-deductible to petitioner. At our behest, the parties addressed this issue in supplemental briefs, and, upon consideration, we are inclined to believe that those payments, relieving as they did a personal liability of a shareholder, were constructive dividends. However, we will not decide this case on that issue. Though we may decide a case on grounds other than those assigned in a statutory notice, Conforte v. Commissioner, 74 T.C. 1160, 1180 (1980); Estate of Horvath v. Commissioner, 59 T.C. 551, 553 (1973); Estate of Finder v. Commissioner, 37 T.C. 411 (1961), we have done so in cases where one party timely made the crucial argument, timeliness being measured by lack of surprise. Ross Glove Co. v. Commissioner, 60 T.C. 569, 595 (1973); *418 Rubin v. Commissioner, 56 T.C. 1155, 1163 (1971), affd. 460 F.2d 1216 (2d Cir. 1972). Our inherent authority is to decide cases upon issues properly before us. Riss v. Commissioner, 57 T.C. 469, 474 (1971), affd. 478 F.2d 731 (8th Cir. 1973). Though the payments in question appear to us to be constructive dividends, [4] that theory was neither raised explicitly or implicitly in the statutory notice of deficiency nor utilized at trial and, therefore, we will not decide this case on that theory. Whether payments made by a corporation which satisfy a legal obligation of a shareholder constitute dividends is a question of fact. Gooding Amusement Co. v. Commissioner, 236 F.2d 159 (6th Cir. 1956), affg. 23 T.C. 408 (1954). It would be manifestly unfair to decide a question of fact adversely to petitioner if petitioner were not on notice prior to trial that it must prove an issue of fact in order to prevail. In his supplemental brief, respondent cited no authority to support the proposition that the basis for disallowance in the statutory notice implied that petitioner must prove that the *419 payments did not constitute constructive dividends. We find that the payments in question were ordinary and necessary business expenses; therefore, we need not determine whether they constituted interest paid on indebtedness. Respondent makes a cursory attempt to convince us that the payments were not "necessary," as required under section 162(a), by contending that such payments were merely an expedient manner to help the personal consciences of Ruff and Dokas. He further asserts that such payments were "without any significant benefit to [petitioner]." While the payments may have assuaged the consciences of Ruff and Dokas, it is beyond question that such payments significantly benefited petitioner. Petitioner had to borrow the $ 35,000 and M & B would not have lent the money to petitioner without its promise to make the questioned payments. *420 In order to be deemed "necessary," payments need only be "appropriate and helpful" to the development of the taxpayer's business. Commissioner v. Tellier, 383 U.S. 687 (1966). The payments here in issue clearly meet that standard. Thus they were, for purposes of section 162(a), "necessary." With substantially more vigor, respondent contends that the payments in question were not "ordinary" in the sense required under section 162(a). Ordinary has the connotation of normal, usual, or customary. Deputy v. Dupont, 308 U.S. 488 (1940). Respondent, citing Welch v. Helvering, 290 U.S. 111 (1933), for a proposition other than the allocation of burden of proof (which burden is, of course, on petitioner), relies on such case for support in characterizing these payments as not ordinary. In that case the taxpayer had been secretary of a grain corporation that was adjudicated a bankrupt and discharged from its debts. Thereafter, the taxpayer made a contract with another company to purchase grain for it on a commission basis, and he sought also to *421 reestablish his relations with customers whom he had known by paying debts owed to those customers by the bankrupt corporation. Justice Cardozo, writing for the Court, found such payments to be capital in nature and not ordinary with, however, this caveat: "Now, what is ordinary, though there must always be a strain of constancy within it, is none the less a variable affected by time and place and circumstance." Welch v. Helvering, supra at 113, 114. The payment of another's debt was found, in that context, not to be ordinary, and respondent would have us extrapolate from that holding that the payments here before us are not ordinary. However, the paying of another's debt is not perse extraordinary. The focus has been, since the Welch case, on whether such payments are made to acquire or promote a new business, as in the Welch case, or are made to retain or protect and promote an established business. If the former, then such expenditures are capital *422 in nature and are not deductible. Carl Reimers Co. v. Commissioner, 19 T.C. 1235 (1953), affd. 211 F.2d 66 (2d Cir. 1954). [5] If the latter, then they are deductible. Snow v. Commissioner, 31 T.C. 585 (1958); L. Heller & Son Inc. v. Commissioner, 12 T.C. 1109 (1949). Thus, the question becomes no whether the payment is of another's debt, but rather whether such payment is made to retain or protect and promote an established business. It seems beyond question that these payments were made to retain or protect petitioner's business, i.e., that the payments were required in order to stave off a financial crisis regarding the Bonnie Brae development. Respondent only weakly disputes this. However, he focuses his final attack on the issue of whether petitioner's business was "established," contending that the payments in question were similar in nature to the non-deductible start-up costs in Welch v. Helvering, supra, and Carl Reimers Co. v. Commissioner, supra. We disagree. The *423 uncontroverted evidence in this case proves that petitioner was an established real estate development corporation at the time the loan agreement requiring the payments was consummated. Much legal, engineering, and platting work took place between the inception of the corporation in late 1965 and the important loan transaction that occurred in 1968. Moreover, petitioner even bought and sold another tract of land during this span of time. It is clear to us that the crisis which precipitated the loan agreement of May 7, 1968, threatened an existing business, and that the payments made under such agreement were made to protect a well-established, ongoing concern. Such payments are not capital in nature. Thus, petitioner has carried its burden of proving that the $ 25,006.56 of disputed payments were ordinary and necessary business expenses deductible under section 162(a). [6]
Concessions having been made by petitioner, Decision will be entered under Rule 155 *424 . Footnotes
1. The only adjustment being contested by petitioner is the disallowance of $ 25,006.56 of expenses deducted on the return filed for its taxable year ended August 31, 1972. Petitioner agrees that the deduction was improperly taken on such return because said $ 25,006.56 was paid during petitioner's taxable years ending August 31 of 1968, 1969, and 1970. Respondent and petitioner agree that if it is determined that the $ 25,006.56 of payments are deductible, then, because of losses suffered by petitioner during those three taxable years, the petitioner's net operating loss carryforward for those years will be increased and its deficiencies for its taxable years ending August 31 of 1971 and 1972 will be decreased.↩
2. See footnote 1.↩
3. All section references are to the Internal Revenue Code of 1954, as amended.↩
4. See Wortham Machinery Co. v. United States, 521 F.2d 160 (10th Cir. 1975); United States v. Smith, 418 F.2d 589 (5th Cir. 1969); Reade Mfg. Co. v. United States, 301 F.2d 803↩ (3d Cir. 1962).
5. Jones Beach Theatre Corporation v. Commissioner, T.C. Memo. 1966-100↩.
6. Respondent concedes on brief that, if the payments are ordinary and necessary, they are deductible. He makes no contention that such payments should be capitalized and amortized over the life of the loan.↩