DONALD C. SMITH, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Smith v. Commissioner
Docket No. 6882-91
United States Tax Court
T.C. Memo 1993-460; 1993 Tax Ct. Memo LEXIS 470; 66 T.C.M. (CCH) 973; September 30, 1993, Filed *470 Decision will be entered under Rule 155. For petitioner: *Heidi Honis-Nash, Fred Tokars, Larry McReynolds, and Michael Welch. For respondent: Carolyn L. Harber. WELLS
WELLS
MEMORANDUM FINDINGS OF FACT AND OPINION WELLS, Judge: Respondent determined the following deficiencies in and additions to petitioner's Federal income taxes: Additions to Tax
Year
Deficiency
Sec. 6653(b)(1)
Sec. 6653(b)(2)
Sec. 6661
1982
$ 13,896
$  8,626
[1]
$  3,474
1983
46,927
23,463
[1]
11,732
1984
46,925
24,422
[1]
11,731
Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. The issues we are asked to decide are: (1) Whether petitioner failed to report gross receipts from his business activities during the taxable years in issue; (2) whether petitioner has substantiated business expenses in excess *471 of the expenses respondent has allowed for the taxable years in issue; (3) whether petitioner is liable for self-employment tax under sections 1401 and 1402 for the taxable years in issue; (4) whether petitioner is entitled to an investment tax credit for taxable year 1984; (5) whether petitioner is liable for additions to tax for fraud under section 6653(b)(1) and (2) for the taxable years in issue; and (6) whether petitioner is liable for additions to tax for substantially understating income under section 6661 for the taxable years in issue. FINDINGS OF FACT Some of the facts and certain documents have been stipulated for trial pursuant to Rule 91. We incorporate the stipulated facts herein by reference. At the time petitioner filed his petition, he resided in Lawrenceville, Georgia. Petitioner's Background
Petitioner is a graduate of the University of Nebraska and a retired United States Air Force Major. After retiring from the Air Force, petitioner graduated from law school. Since 1974, petitioner has operated a business, which he describes as a part-time employment agency that places models with clients for a fee (modeling agency). [1] Petitioner operated his modeling *472 agency using various names such as: V.I.P. Enterprises, Inc.; A-OK Referrals, Inc.; V.I.P. Referrals, Inc.; A. Peachtree Agency; AAA Parttimers; Aardvark; Aachen Abilene; and Aachen Abalone. V.I.P. Enterprises, Inc.
During taxable year 1982, from January 1, 1982, through February 26, 1982, petitioner operated his modeling agency using the names of V.I.P. Enterprises, Inc., and A-OK Referrals, Inc. On February 26, 1982, petitioner sold his modeling agency to Lynn House for a contract price of $ 50,000 to be satisfied by $ 35,000 in certified funds and a $ 15,000 promissory note. [2] Ms. House only paid petitioner $ 41,750 for the modeling agency. During November 1982, Ms. House defaulted on the promissory note relating to the purchase. During December 1982, petitioner sued Ms. House and V.I.P. Enterprises, Inc., for breach of contract. *473 Financing Modeling Agencies - Post V.I.P. Enterprises
From approximately March 1, 1982, through July 1982, petitioner financed a modeling agency for Pat Ware. After terminating the arrangement with Ms. Ware and, until the beginning of 1983, petitioner financed another modeling agency for William Rice. V.I.P. Referrals, Inc.
During January 1983, petitioner resumed operation of his own modeling agency. During March 1983, petitioner incorporated V.I.P. Referrals, Inc., which petitioner used as a trade name to operate the modeling agency. Petitioner applied for several business licenses in the name of V.I.P. Referrals, Inc., for 1983 and 1984 with the City of Atlanta. During taxable years 1983 and 1984, petitioner operated his modeling agency 7 days a week, 52 weeks a year. On weekdays, petitioner operated from approximately 10:00 a.m. until 3:00 a.m. and on weekends from approximately noon until 3:00 a.m. Modeling Agency Business
In the operation of his modeling agency, petitioner hired independent contractors as "models", and employed office personnel, and office managers. Petitioner hired at least 20 to 30 models at his agency during the taxable years *474 in issue and had at least 11 telephone numbers. The method of operating the modeling agency followed a general pattern. When a customer telephoned petitioner's modeling agency, the employee answering the phone quoted the customer an agency fee charged for each referral of a model. The employee then obtained the customer's name, telephone number, location, desired method of payment, and, if the customer wanted to pay by credit card, the credit card number and expiration date. Subsequently, the employee verified the customer's location and checked the customer's name against a "Do Not Serve" list. If given a credit card number, the employee obtained approval for the charge before referring the appointment to a model. The information regarding each appointment was recorded in a daily appointment log. Thereafter, a model called the customer and arranged the details of an appointment before going to the customer's location. The models collected $ 100 to $ 150 per appointment from each customer which included the agency fee and a "tip". When the model completed the appointment, he or she contacted petitioner's office. The person answering the telephone transferred the information *475 from the appointment log to a "fees owed" list. The "fees owed" list reflected the following for each completed appointment: The name of the model and customer; the manner of payment; any agency, credit card processing, listing, and credit card imprinter fees the model owed; the net amounts due the model; and dates and check numbers related to petitioner's payments to the model. Although models were required to bring the agency fees to petitioner (or an office employee) within 24 hours of the appointment, models usually brought the fees to the agency within 3 days of the appointment. Petitioner or his employees placed the money and credit card vouchers (vouchers) received from the models in envelopes at petitioner's office. Petitioner or his office employees prepared written receipts for cash and vouchers received from the models. Petitioner or his employees marked an appointment as paid on the "fees owed" list when the models paid the amounts owed. Before the models were paid their share of the vouchers, petitioner offset any unpaid agency fees, credit card processing fees of 10 to 15 percent, [3] and during a portion of the taxable years in issue, listing fees of $ 20 and fees *476 for the use of credit card imprinters. On Fridays, petitioner paid the models net fees from the vouchers to the extent a model's fee exceeded the fees the model owed to him. Petitioner's office employees answering the telephones received wages of $ 5 per hour and a commission of $ 5 per completed appointment. Petitioner paid expenses, which included models' net fees from the vouchers and commissions to telephone personnel, by check or cash. Credit Card Processing
During the taxable years in issue, petitioner processed vouchers for his models and various other people through numerous merchant accounts which he owned. The procedure he used for processing vouchers followed a general pattern. When petitioner received the funds from a voucher, he retained a processing fee of 10 percent and paid the *477 net amount due the person for whom he was processing the voucher. The processing fee covered the fee the credit card company charged for processing the vouchers and potential charge backs for unpaid amounts. During the taxable years in issue, petitioner maintained Master Charge/VISA merchant accounts under the names V.I.P. Florist, #1 Photo Studio, and AAA Parttimers; a Diner's Club/Carte Blanche merchant account under the name of V.I.P. Florist; and American Express merchant accounts under the names Southern Grounds, Smith's Attic, and Building Air Systems, Inc. Also, during the taxable years in issue, petitioner agreed to process vouchers for others for fees owed petitioner and his models. In such cases, petitioner retained a processing fee of 15 percent of the gross amount of the voucher, which was to cover the fee charged by the owner of the merchant account, the credit card company fees, and the possibility of charge backs for unpaid amounts. During the taxable years in issue, petitioner processed charges through a merchant account owned by John Reddick in the name of Dive Sales Salvage and a merchant account owned by Charles Engleberger in the name of For Kids Only. Six *478 to 19 days after he submitted the vouchers to the credit card company, petitioner deposited funds he received from the vouchers. Checking and Savings Accounts
During the taxable years in issue, petitioner maintained a savings account at the Atlanta Coca-Cola Bottling Credit Union. Petitioner made all deposits to that account. Also, petitioner maintained a Loanliner line of credit at the credit union. During 1982, petitioner maintained a checking account in his name and the name of his wife, Sandra Smith, at Citizens and Southern National Bank (C & S account). Petitioner had the sole signatory authority over, made all deposits to, and wrote all the checks on the C & S account from March 1, 1982, through December 31, 1982. From March 1, 1982, through December 31, 1982, petitioner deposited $ 57,304.89 to the C & S account. Some of the deposits were business receipts. The remaining deposits consisted of the following: Item Amount Loans from Sandra Smith
$    148.75
Loans from Bottling Credit
1,450.00
Transfer from Account at
Bottling Credit
1,000.00
Retirement Income
13,008.76
Proceeds from sale of V.I.P.
Enterprises, Inc.
6,750.00
Proceeds from sale of personal boat
6,500.00
Proceeds from sale of condominium
17,962.32
Total
$ 46,819.83
*479 From January 1, 1982, through September 15, 1982, petitioner maintained an account in the name of #1 Photo Studio at First National Bank of Cobb County (FNB account). Petitioner had the sole signatory authority over, made all deposits to, and wrote all the checks on the FNB account. From March 1, 1982, through September 15, 1982, petitioner deposited $ 30,009.85 to the FNB account, consisting of transfers totaling $ 10,500 from petitioner's other accounts and vouchers from his modeling agency and third parties. From March 1, 1982, through December 31, 1982, petitioner maintained an account in the name of V.I.P. Florist at Gwinnett Bank & Trust (GBT account). Petitioner had the sole signatory authority and wrote all the checks on the GBT account. From March 1, 1982, through December 31, 1982, petitioner deposited $ 12,770.12 into the GBT account from the vouchers of his modeling agency and third parties. From March 1, 1982, through December 31, 1982, petitioner's total deposits into his known checking accounts were: C & S account, $ 57,304.89; FNB account, $ 30,009.85; and GBT account, $ 12,770.12; totaling $ 100,084.86. Of that total, however, $ 57,319.89 was not taxable, *480 leaving a net taxable deposit of $ 42,764.97. Additionally, during portions of the taxable years in issue, petitioner maintained the following bank accounts: An individual account at Citizens and Southern National Bank; a second account in his and his wife's names at Citizens and Southern National Bank; an account in the name of Donald C. Smith d/b/a/ Smith's Attic at Citizens and Southern National Bank; and a savings account at Citizens and Southern National Bank. Law Enforcement Investigations
Petitioner kept his business and personal records in numerous and varied places including his residences, his businesses, his son's residence, and his vehicles. On July 19, 1983, the Atlanta Metro Drug and Vice Squad (Metro) seized some of petitioner's records from his place of business at 2285 Peachtree Road, Atlanta, Georgia. Among the records seized were three unnegotiated checks to models and pages from his appointment book for July 7 and 8, 1983, and July 10 through July 19, 1983. On September 10, 1984, pursuant to a search warrant, the Georgia Bureau of Investigation (GBI), assisted by Metro, seized a portion of petitioner's records and property from his place of business *481 at 1925 Piedmont Circle. The seized items included three agency memoranda, instructions to office personnel, blank contract forms, three advertisements, credit card information, a list of telephone numbers, a list of models' names, business cards, telephones, credit card imprinters, a gun, $ 725, eight pages of "fees owed" lists, four receipts for payments by models, three unprocessed credit card receipts, six checks, "Do Not Serve" file, four checkbooks, miscellaneous bills and receipts, a schedule of telephone personnel from July 27, 1984, to September 13, 1984, and pages from petitioner's appointment book for August 28 through August 30, 1984, and September 6 through September 10, 1984. Also on September 10, 1984, the GBI conducted a "consent" search at petitioner's residence and seized 80 contracts for models and personnel. On October 11, 1984, local law enforcement officials seized some of petitioner's records from his business at 1925 Piedmont Circle. The records included a list of models and telephone personnel, telephone numbers, a schedule of hours worked and the number of calls taken on October 5 through October 10, 1984, two pages of "fees owed" lists, two unnegotiated *482 checks, six receipts from models, and pages from petitioner's appointment book for October 6 through October 11, 1984. The Internal Revenue Service (IRS) did not participate in any of the investigations of petitioner by the local law enforcement authorities, Metro, or the GBI. The IRS did not participate in the seizures of petitioner's records. By letter dated June 27, 1989, petitioner's representative requested the return of items seized by the GBI on September 10, 1984. The GBI returned cash of $ 725 and a gun. On May 4, 1992, petitioner was advised that the Solicitor of Fulton County destroyed the records relating to Metro's investigations of petitioner because of the age of the documents. Taxable Year 1982
During taxable year 1982, petitioner reported on his tax return Air Force retirement income in the amount of $ 17,650.74. Petitioner did not report the sale of his business to Ms. House. Petitioner did not report any of his business gross receipts or interest income for taxable year 1982. Petitioner did not claim any itemized deductions for taxable year 1982. Petitioner realized a taxable long-term capital gain of $ 41,750 during taxable year 1982 from the sale *483 of his business to Ms. House but did not report the gain on his 1982 tax return. Although the 1982 return was due on April 15, 1983, it was not received by respondent until June 20, 1983. Petitioner prepared the return and did not file for an extension of time. Taxable Year 1983
During taxable year 1983, petitioner reported Air Force retirement income in the amount of $ 18,332.16. Petitioner did not report any of his business gross receipts for taxable year 1983. Petitioner did not claim any itemized deductions on his return for taxable year 1983. Petitioner employed H & R Block to prepare his taxable year 1983 income tax return. H & R Block secured an extension of time to file petitioner's 1983 return until August 15, 1984. The return was prepared by May 22, 1984, and was timely filed on May 29, 1984. Taxable Year 1984
During taxable year 1984, petitioner reported Air Force retirement income in the amount of $ 16,939.78, interest income of $ 365, gross receipts of $ 104,902, deductions of $ 102,385, and an investment tax credit of $ 2,187 related to his modeling agency. Petitioner received an extension of time to file his return for taxable year 1984 on August *484 15, 1985. The return was received by respondent on August 22, 1985. Income Reconstruction and Internal Revenue Service Examination
By the month of August 1984, petitioner had employed James Clarke, Jr. to reconstruct his records for his modeling agency and amend his return for taxable year 1983. On February 1, 1985, the IRS commenced an examination of petitioner's return for taxable year 1982. After IRS Revenue Agent Katherine Stevens contacted petitioner during February 1985, petitioner expanded Mr. Clarke's employment to the reconstruction of expenses and income for the modeling agency for taxable year 1982 and preparing his return for taxable year 1984. Subsequently, the IRS examined petitioner's returns for taxable years 1983 and 1984. In the process of reconstructing his records, petitioner told Mr. Clarke that he did not have any records because he had lost them or law enforcement officers had seized them. Mr. Clarke advised petitioner to obtain his bank records so that he could reconstruct petitioner's income and expenses. Petitioner provided Mr. Clarke with a few original bank statements and many copies of statements and canceled checks. Petitioner also provided *485 Mr. Clarke with a few deposit slips, petitioner's check registers for his personal account for taxable years 1982 and 1983, a few receipts reflecting cash payments by models for taxable year 1984, and a few bills. Petitioner told Mr. Clarke that he had minimal cash receipts in his businesses and that any cash would be spent on business expenses such as supplies and entertainment. Mr. Clarke used the documents petitioner provided to prepare an analysis of deposits and expenditures regarding petitioner's bank accounts during the taxable years in issue and work papers for petitioner's income tax return for taxable year 1984. Petitioner did not show Mr. Clarke records or provide him information unless Mr. Clarke specifically asked for such records or information. If petitioner did not provide an adequate explanation for canceled checks, such as checks to cash, Mr. Clarke treated them as personal. Because the examination had begun, petitioner did not amend his returns for taxable years 1982 and 1983. Petitioner reviewed Mr. Clarke's analyses and provided them to Agent Stevens, who was examining petitioner's returns. In response to Agent Stevens' requests, petitioner provided her *486 with copies of his bank statements and canceled checks for taxable years 1982 and 1983, a portion of his check registers for his personal accounts for taxable years 1982 and 1983, two deposit slips for taxable year 1982, and documents related to the sale of his business to Ms. House. After petitioner told Agent Stevens of the seizures by Metro and the GBI, Agent Stevens contacted Metro. She obtained copies of the seized documents, including the pages from petitioner's appointment logs, "fees owed" lists, receipts, and miscellaneous records, which were seized during the July 19, 1983, September 19, 1984, and October 11, 1984, seizures. Respondent's Determination of Petitioner's Income
Respondent's determination in the notice of deficiency is based upon the examination of petitioner's records and interviews of witnesses by Agent Stevens. Agent Stevens concluded that petitioner did not deposit many of his cash receipts. Because Mr. Clarke's bank deposits analyses did not reflect such cash receipts during the times when petitioner was openly operating a modeling agency, Agent Stevens did not use them to calculate petitioner's income for the periods of January 1, 1982, through *487 February 26, 1982, and January 1, 1983, through December 31, 1984. For such periods, Agent Stevens calculated petitioner's business income by projections based on average daily paid appointments. Petitioner's appointment logs for 18 days (July 7 and 8, 1983, July 10 through July 18, 1983, August 28 through August 30, 1984, and September 6 through September 9, 1984) showed 96 total paid appointments, upon which Agent Stevens based her calculation that petitioner had an average of 5.33 paid appointments per day. For taxable year 1982, Agent Stevens calculated that petitioner had approximately 304 paid appointments from January 1, 1982 through February 26, 1982 (5.33 average paid appointments per day multiplied by the 57-day period petitioner operated the modeling agency). She also calculated that petitioner had total agency fees of $ 15,200 during such time, based upon her determination that petitioner's agency fee was $ 50 during taxable year 1982, multiplied by 304 appointments. For taxable years 1983 and 1984, Agent Stevens calculated that petitioner's daily agency fees were $ 319.80, based upon her determination that petitioner's agency fee was $ 60 during taxable years 1983 *488 and 1984, multiplied by 5.33 average appointments per day. Because petitioner operated 365 days during each year, Agent Stevens calculated that petitioner received total agency fees of $ 116,727 for each taxable year. Because petitioner sold his business to Ms. House on February 26, 1982, Agent Stevens used the bank deposits method of proof to calculate petitioner's gross income from March 1, 1982 through December 31, 1982. The deposits were based on the analyses prepared by Mr. Clarke. For taxable year 1982, Agent Stevens calculated petitioner's credit card processing income by first calculating petitioner's total average fees from January 1 through February 26, 1982 (304 appointments multiplied by respondent's determined average gross fee per appointment of $ 200). She multiplied the total average fees ($ 60,800) by the percentage of fees which she concluded customers paid by credit card (50 percent). Finally, she multiplied the resulting amount ($ 30,400) by a processing charge of 15 percent to calculate petitioner's total credit card processing fee income as $ 4,560 for taxable year 1982. Agent Stevens calculated petitioner's credit card processing fee income for taxable *489 years 1983 and 1984 by multiplying the average number of paid appointments per day (5.33) by the average gross fee ($ 200) resulting in average daily gross fees of $ 1,066. Agent Stevens calculated petitioner's total average fees by multiplying daily gross fees of $ 1,066 by 365. She concluded that 50 percent of the fees, or $ 194,545, were attributable to credit cards. She used 15 percent as the processing charge to calculator credit card processing fee income for petitioner of $ 29,181.75 per year. Respondent determined petitioner's total income from his modeling agency during the taxable years in issue as follows: Agency Fee
Credit Card Year
Income
Processing Income
Total 1982
$  15,200
$  4,560.00
$  19,760.00
1983
116,727
29,181.75
145,908.75
1984
116,727
29,181.75
145,908.75
For taxable year 1982, respondent determined that petitioner was allowed a deduction for credit card receipt disbursements of $ 20,798.45 for the period from March 1, 1982, through December 31, 1982. Also, respondent determined that petitioner was allowed business deductions in the total amount of $ 31,676 for such period. For taxable years 1983 and 1984, respondent determined *490 that petitioner was allowed business deductions in the total amounts of $ 55,305 and $ 55,324, respectively. OPINION Income and Deductions
Respondent contends that petitioner understated the taxable income that was required to be shown on his income tax returns for the taxable years in issue. Petitioner contends that respondent improperly computed his taxable income by using the wrong method and, alternatively, by making errors in the method respondent used. Gross income is "all income from whatever source derived" and includes income derived from a business. Sec. 61(a). Taxpayers are required to maintain books and records sufficient to establish gross income. Sec. 6001; DiLeo v. Commissioner, 96 T.C. 858, 867 (1991), affd. 959 F.2d 16 (2d Cir. 1992); Estate of Mason v. Commissioner, 64 T.C. 651, 656 (1975), affd. 566 F.2d 2 (6th Cir. 1977). If a taxpayer's books and records are inadequate for the purpose of ascertaining the taxpayer's income, respondent is authorized to reconstruct the taxpayer's income by whatever method will clearly reflect income. *491 Sec. 446; Holland v. United States, 348 U.S. 121, 130-132 (1954); Petzoldt v. Commissioner, 92 T.C. 661, 686-687 (1989); Conforte v. Commissioner, 74 T.C. 1160, 1181 (1980), affd. in part and revd. in part on other grounds 692 F.2d 587 (9th Cir. 1982). As the circumstances will vary in each case, no particular method of reconstructing the taxpayer's income is required. Conforte v. Commissioner, supra; Harbin v. Commissioner, 40 T.C. 373, 377 (1963). Respondent's reconstruction of the taxpayer's income when the taxpayer's records are inadequate need only be reasonable in light of all surrounding facts and circumstances. Petzoldt v. Commissioner, supra at 687; Giddio v. Commissioner, 54 T.C. 1530, 1533 (1970); Schroeder v. Commissioner, 40 T.C. 30, 33 (1963). Respondent's determination of a deficiency based upon reconstructed income normally is presumed to be correct, Webb v. Commissioner, 394 F.2d 366, 372 (5th Cir. 1968), *492 affg. T.C. Memo. 1966-81; Cefalu v. Commissioner, 276 F.2d 122, 125-126 (5th Cir. 1960); Bryan v. Commissioner, 209 F.2d 822, 825 (5th Cir. 1954), affg. a Memorandum Opinion of this Court dated October 10, 1951, and petitioner bears the burden of proving that such determination is erroneous. Rule 142(a); Parks v. Commissioner, 94 T.C. 654, 658-659 (1990). 1. Bank Deposits -- March 1, 1982, through December 31, 1982
For taxable year 1982, petitioner's income from March 1, 1982, through December 31, 1982, was reconstructed through the bank deposits method. "The use of the bank deposit method for * * * [reconstructing] income has long been sanctioned by the courts." Estate of Mason v. Commissioner, supra at 656. Bank deposits are prima facie evidence of income. DiLeo v. Commissioner, supra at 868; Tokarski v. Commissioner, 87 T.C. 74, 77 (1986); Estate of Mason v. Commissioner, supra.Under the bank deposits method, all *493 money deposited in a bank account during a given period is assumed to constitute taxable income. DiLeo v. Commissioner, supra.Respondent, however, must take into account nontaxable sources or deductible expenses. Id.
Petitioner's accountant, Mr. Clarke, analyzed petitioner's bank accounts for the period March 1, 1982, through December 31, 1982, and concluded that petitioner's taxable income for such period was $ 42,765.83. Respondent accepted Mr. Clarke's analyses because petitioner was not actively operating a modeling agency during such period. Consequently, there is no dispute that petitioner's taxable income for the period March 1, 1982, through December 31, 1982, is $ 42,765.83. For the period March 1, 1982, through December 31, 1982, respondent reduced petitioner's bank deposits by $ 20,798.45 for credit card receipts which petitioner paid to third parties. Petitioner failed to offer any evidence or any arguments that he was entitled to any additional deductions during such period. Consequently, we hold that petitioner is not entitled to any additional deductions beyond the deductions allowed by respondent in the notice of deficiency. *494 Rule 142(a). 2. Projected Income -- January 1, 1982, through February 26, 1982, and January 1, 1983, through December 31, 1984.
Because petitioner was missing records, and dealt in cash to some extent, respondent contends that, for the period from January 1 through February 26, 1982, and for taxable years 1983 and 1984, petitioner's income must be reconstructed by projections. Respondent reconstructed petitioner's income for such period from facts that were available at the time. Petitioner contends, however, that respondent should not have used two different methods of reconstructing petitioner's taxable income, but should have used the bank deposits method in determining petitioner's income for all of the taxable years in issue. In reconstructing a taxpayer's income, the Commissioner is not required to attain "mathematical exactitude," for, if such were the case, "it 'would be tantamount to holding that skillful concealment is an invincible barrier to proof.'" Petzoldt v. Commissioner, 92 T.C. at 693-694 (quoting United States v. Johnson, 319 U.S. 503, 517-518 (1943)). Respondent reconstructed petitioner's *495 income for a portion of taxable year 1982 by using the bank deposits method because petitioner was not actively operating the modeling agency during such period. During the time when petitioner was actively operating the modeling agency, however, respondent concluded that petitioner did not deposit cash received from such operations into his bank accounts. Respondent concluded that petitioner's income would be more accurately reflected during the remainder of taxable year 1982 and taxable years 1983 and 1984 by projecting petitioner's income based on the information known to respondent. We agree with respondent. Because petitioner was dealing in cash during the period when he was operating the modeling agency, use of the bank deposits method alone would not accurately take into account petitioner's cash dealings. Consequently, the determination of petitioner's income under two methods was reasonable. Hong v. Commissioner, T.C. Memo. 1992-58 (Commissioner's projection of income analysis to reconstruct income in case where taxpayer customarily dealt in cash upheld). Petitioner also contends that the assumptions respondent used in projecting petitioner's *496 income are invalid. Respondent calculated that petitioner's models had 96 paid appointments in 18 days for an average figure of 5.33 paid appointments per day. Petitioner contends that, in calculating the average appointments per day, respondent failed to include July 9, 1983, September 5, 1984, and certain days during October 1984. We, however, do not find any clear evidence in the record regarding July 9, 1983, or September 5, 1984. Neither of such days is mentioned in the pages of petitioner's appointment log, and petitioner has neither testified regarding such days nor pointed to any evidence regarding such days. Consequently, we hold that respondent did not err in omitting July 9, 1983, and September 5, 1984, from respondent's analysis of average daily paid appointments. As to the month of October 1984, respondent's analysis of average daily paid appointments notes that none of the appointments for the month of October 1984 were included because the appointment pages were seized prior to the time the pages would have been marked as paid or unpaid. In calculating petitioner's average daily paid appointments, however, respondent included July 7, 8, and July 10 through July *497 18, 1983, even though such records were seized on July 19, 1983, and respondent included August 28 through August 30, 1984, and September 6 through September 9, 1984, even though such records were seized on September 10, 1984. Consequently, we do not accept the logic of respondent's reasoning that the October 1984 records should be omitted from the analysis. We, however, do find that respondent did not err in omitting October 11, 1984, because that was the date the records were seized. By including the October 1984 days, the number of appointments increases to 110 over a period of 23 days (rather than 96 appointments over 18 days). Accordingly, we reduce the average number of paid appointments per day to 4.78 instead of the 5.33 average daily appointment figure used by respondent. We turn next to petitioner's contention that respondent did not use the correct agency fees for the years in issue to project petitioner's income. Respondent used an agency fee of $ 50 per referral for taxable year 1982 and $ 60 per referral for taxable years 1983 and 1984. Petitioner contends that the agency fee should be $ 35 to $ 40 for taxable year 1982, $ 45 to $ 50 for taxable year 1983, and *498 $ 55 to $ 60 for taxable year 1984. Petitioner bases his contention on his testimony and the testimony of former employees. Ms. Lisa Britt testified that she worked for petitioner during January and February of 1982 and March and April of 1983, and that the referral fee was $ 45 during such months. Additionally, Ms. Carol Altman testified that she worked for petitioner during December 1982, January and February 1983, and March through June 1984, and that the referral fee was $ 40 to $ 55 during such months. Regarding the referral fee, petitioner testified: "As I remember, it was $ 35 in 1982, pretty much the entire year; and in '83, I believe it went to $ 45; and then in '84, I believe it went to $ 60." In interrogatories, however, petitioner stated: "To the best of my knowledge the agency placement fee for the years in issue ranged from $ 40.00 to $ 60.00, depending on the year and the customer." Agent Stevens, whom we found to be a credible witness, testified that petitioner told her that for taxable year 1982 the referral fee was $ 50. As to taxable year 1983, pages from petitioner's appointment log for July 7, 8, and July 10 through July 19, 1983, and an office memorandum *499 dated December 1983 indicate that the referral fee during such time was $ 60. As to taxable year 1984, petitioner's appointment log pages for August 28 through August 30 and September 6 through September 10, 1984, reflect that the referral fee was $ 60. Based on the record in the instant case, we hold that petitioner has failed to prove that respondent's determination of a $ 50 referral fee for taxable year 1982 and a $ 60 referral fee for taxable years 1983 and 1984 was erroneous. Finally, petitioner asserts that he is entitled to a computation of his deductions under Cohan v. Commissioner, 39 F.2d 540, 544 (2d Cir. 1930). The only deduction to which petitioner specifically refers in his brief is the credit card company fee charged for processing vouchers. Petitioner contends that he is entitled to a deduction of 3 to 6 percent of the projected credit card vouchers, which is the fee which the credit card company normally charged. Petitioner bases his contention on the testimony of Mr. Dennis Sterk, petitioner's accountant since 1986. Although petitioner has not established the exact amount of the deduction for merchant fees, we do believe that *500 he has established that he did incur credit card processing fees. Based on the testimony of Mr. Clarke and Agent Stevens, and weighing heavily against petitioner as required by the Cohan rule, we hold that, during the taxable years in issue, petitioner is entitled to deduct credit card processing fees in the amount of 3 percent of the estimated total of credit card income during January 1, 1982, through February 26, 1982, and taxable years 1983 and 1984. Cohan v. Commissioner, supra. Petitioner, however, has failed to prove that he is entitled to any deduction other than merchant fees. Self-Employment Tax
Section 1401 provides that a tax shall be imposed on the self-employment income of every individual. The term "self-employment income" means an individual's net earnings from self-employment. Sec. 1402(b). Section 1402(a) defines the term "net earnings from self-employment" as the gross income of an individual from any trade or business carried on by the individual less allowed deductions. Under section 1402, a trade or business has the same meaning as in section 162. Sec. 1402(c). To be engaged in a trade or business under *501 section 162, the Supreme Court has stated that: "the taxpayer must be involved in the activity with continuity and regularity and that the taxpayer's primary purpose for engaging in the activity must be for income or profit." Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987). Petitioner has the burden of proving that he is not liable for self-employment taxes. Rule 142(a). Petitioner, however, has failed to offer any evidence or make any arguments that he is not liable for self-employment taxes. Consequently, we sustain respondent's determination. Investment Credit
Section 38 allows an investment credit against income tax pursuant to sections 46 and 48. Section 46(a) and (c) allows a credit of a specified percentage of an investment in qualifying property. Petitioner has the burden of proving that he is entitled to an investment credit. Rule 142(a). Petitioner, however, has failed to offer any evidence or make any arguments that he is entitled to the investment credit he claimed on his return for taxable year 1984. Consequently, we sustain respondent's determination. Fraud
Respondent determined that petitioner was liable for *502 the fraud addition to tax pursuant to section 6653(b)(1) and (2) for all taxable years in issue. Section 6653(b)(1) provides for an addition to tax of 50 percent of the underpayment if any part of the underpayment is due to fraud, and section 6653(b)(2) provides for an addition to tax in the amount of 50 percent of the interest payable with respect to the portion of the underpayment attributable to fraud. Fraud is a question of fact which respondent must prove by clear and convincing evidence. Sec. 7454(a); DiLeo v. Commissioner, 96 T.C. 858, 874 (1991), affd. 959 F.2d 16 (2d Cir. 1992). "Fraud is defined as an intentional wrongdoing designed to evade tax believed to be owing." Id.
To establish petitioner's liability for the addition to tax for fraud, respondent must prove that petitioner underpaid his taxes for each of the years in issue. DiLeo v. Commissioner, supra at 873; Parks v. Commissioner, 94 T.C. 654, 660-664 (1990); Hebrank v. Commissioner, 81 T.C. 640, 642 (1983). Petitioner does not dispute the fact that *503 he underpaid his taxes for each of the years in issue. As noted above, petitioner only contends that respondent's analysis produced too much income. Respondent also has the burden of proving that petitioner had the requisite fraudulent intent. DiLeo v. Commissioner, supra at 873; Parks v. Commissioner, supra at 660-664; Hebrank v. Commissioner, supra at 642. Respondent's burden is met by a showing that petitioner intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968); Katz v. Commissioner, 90 T.C. 1130, 1143 (1988); Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983). Respondent may use circumstantial evidence to prove fraud. DiLeo v. Commissioner, supra at 874-875; Parks v. Commissioner, supra at 664; Rowlee v. Commissioner, supra at 1123. The *504 taxpayer's entire course of conduct may be examined to establish the requisite fraudulent intent. Stone v. Commissioner, 56 T.C. 213, 223-224 (1971). A pattern of consistent underreporting of income, especially when accompanied by other circumstances showing an intent to conceal, justifies the inference of fraud. Holland v. United States, 348 U.S. at 137; Parks v. Commissioner, supra. The mere failure to report income, however, is not sufficient to establish fraud. Merritt v. Commissioner, 301 F.2d 484, 487 (5th Cir. 1962), affg. T.C. Memo. 1959-172; Parks v. Commissioner, supra.
The "badges of fraud" which may be taken into account include: The making of false and inconsistent statements to revenue agents, Grosshandler v. Commissioner, 75 T.C. 1, 20 (1980); the filing of false documents, Stephenson v. Commissioner, 79 T.C. 995, 1007 (1982), affd. 748 F.2d 331 (6th Cir. 1984); the understatement of income, *505 inadequate records, failure to file tax returns, implausible or inconsistent explanations of behavior, concealment of assets, and failure to cooperate with tax authorities, Bradford v. Commissioner, 796 F.2d 303 (9th Cir. 1986), affg. T.C. Memo. 1984-601. Further indicia of fraud are: Engaging in illegal activities; attempting to conceal the activities; dealing in cash; and failing to make estimated tax payments. Meier v. Commissioner, 91 T.C. 273, 298 (1988) (citing Bradford v. Commissioner, supra). In addition to petitioner's failure to report income, respondent contends the following "badges of fraud" exist in the instant case: (1) Petitioner concealed information from the preparer of his 1983 income tax return; (2) petitioner misled the accountant he hired to reconstruct his records for the taxable years in issue and prepare his 1984 income tax return; (3) petitioner told the City of Atlanta that petitioner's business was a modeling agency not an escort service; (4) petitioner operated under numerous business names and failed to obtain a license for all the names; (5) petitioner had *506 numerous bank accounts and merchant accounts in different names; (6) petitioner dealt in cash; (7) petitioner presented bank analyses to respondent from which he knowingly omitted cash receipts; (8) petitioner made inconsistent statements to the revenue agent; and (9) petitioner was well educated. As petitioner offers explanations to rebut the inferences of fraud as to each of such badges, we will address each of them in turn. Respondent first contends that petitioner concealed information from the preparer of his taxable year 1983 income tax return. Ms. Helen Bersch testified that under the procedure she always used, she would not have signed off on a return that did not report all of the taxpayer's income. Petitioner testified that he told Ms. Bersch about the missing records and 3 months after the return was filed he hired Mr. Clarke to reconstruct his records to amend his return for taxable year 1983. We, however, do not find petitioner to be a credible witness and therefore do not credit his testimony that he informed Ms. Bersch of all of his income. Respondent next asserts that petitioner misled Mr. Clarke in the process of reconstructing his records and preparing his *507 1984 return by concealing records from him. Petitioner contends that he did not misled Mr. Clarke and points to his testimony that his records had been lost, seized, or not returned to him by Ms. House. We find that petitioner's self-serving explanation lacks credibility. Respondent also contends that petitioner did not tell Mr. Clarke about his business relationships with Ms. Ware and Mr. Rice. Mr. Clarke testified only that he did not recall petitioner's having mentioned such relationships. Respondent contends that petitioner did not tell Mr. Clarke about the fees he charged the models for the credit card imprinters. Again, Mr. Clarke could only testify that he did not recall whether petitioner had told him of the fees. Respondent contends that petitioner falsely told Mr. Clarke that the business had minimal cash receipts. In response, petitioner points to his testimony that the models kept most of the cash, that he occasionally paid the telephone personnel in cash, and that he paid some business expenses in cash. We also find petitioner's self-serving explanation of the reason he did not inform Mr. Clarke of his cash receipts lacking in credibility. Finally, respondent *508 contends that petitioner falsely told Mr. Clarke that a boat was business property acquired in 1984 when the boat was purchased in 1983. The record supports respondent's assertion regarding petitioner's false statement about the boat. Based on the record in the instant case, we conclude that petitioner misled Mr. Clarke in an attempt to conceal income. Although respondent contends that petitioner falsely told the City of Atlanta that his business was a modeling agency, rather than an escort service, the record does not support a finding that he made such statements to the City. Respondent next points to the numerous business names under which petitioner operated his modeling agency without obtaining individual business licenses. The record shows that petitioner did fail to list on his business license the alternative names under which he was doing business. Respondent contends that petitioner's use of numerous bank accounts and merchant accounts in names other than V.I.P. Referrals, Inc., is evidence of fraud. The record establishes that petitioner operated under numerous accounts. As petitioner has not presented a plausible explanation for the myriad of accounts in various *509 names, we believe their purpose was to conceal his activities and his income. As evidence of fraud, respondent next points to petitioner's use of cash. Petitioner relies on his testimony mentioned above that the models kept the majority of the cash, that he occasionally paid the telephone personnel in cash, and that he occasionally paid business expenses in cash. Petitioner's explanation lacks credibility. Moreover, it is so general that it fails to adequately explain his cash dealings. We find that respondent has established that petitioner dealt extensively in cash in his business. Petitioner's procedures for handling the cash collected by the models is further evidence of attempts to conceal income. As another indicator of petitioner's fraud, respondent points to the fact that petitioner presented his bank analyses to respondent's agent without including cash receipts. Petitioner offers the same explanation based upon his testimony that the models usually kept the cash, that only some business expenses were made in cash, and that he only occasionally paid the telephone personnel in cash. Petitioner's explanation is unconvincing and fails to explain why he failed to include *510 cash receipts when he knew well that expenses were being paid with cash receipts. Respondent also points to petitioner's inconsistent statements. Agent Stevens testified that petitioner told her that cash receipts amounted to approximately 2 or 3 percent of petitioner's business. Petitioner, however, testified that cash receipts were approximately 35 percent of his business. We find that petitioner's inconsistent statement to Agent Stevens is evidence of his attempt to conceal income. Petitioner also failed to tell Agent Stevens about the extent of the merchant accounts available for his use in processing credit card receipts and his failure to mention the fee he charged the models for the credit card imprinters. Petitioner's failure to mention such accounts when coupled with his active attempts to persuade respondent's agent with his own income reconstruction is evidence of petitioner's attempt to conceal income from respondent. Additionally, petitioner told Agent Stevens about a petty cash fund, which was determined to be nonexistent based on the testimony of two of petitioner's employees. We consider petitioner's inconsistent statements to be designed to prevent the collection *511 of taxes. Finally, respondent points to petitioner's level of education. Although petitioner's education, standing alone, is not evidence of fraud, we consider it along with the other badges of fraud. Petitioner was well educated, having completed college and law school and having retired from the Air Force as a major. Considering petitioner's level of education and the record in the instant case, we hold that respondent has proved through clear and convincing evidence that the entire amount of each underpayment is due to fraud. Consequently, we hold that petitioner is liable for the fraud additions to tax for each of the taxable years in issue. Substantial Understatement of Income
Respondent determined an addition to tax under section 6661 against petitioner for each of the years in issue. An addition is proper under section 6661 if petitioner substantially understated his income tax. The amount of the addition is 25 percent of the amount of any underpayment attributable to such understatement for such taxable year. Pallottini v. Commissioner, 90 T.C. 498 (1988). Petitioner has the burden of proving respondent's determinations under *512 section 6661 are incorrect. Weis v. Commissioner, 94 T.C. 473, 490 (1990). Petitioner failed to make any arguments that he did not substantially understate his income. Consequently, we sustain respondent's determination. All other arguments of petitioner have been considered and found to be without merit. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
*. Subsequent to trial, but prior to briefing, Larry McReynolds and Michael Welch withdrew from the case. After briefing, Heidi Honis-Nash and Fred Tokars withdrew from the case.↩
1. 50 percent of the interest due on the deficiency.↩
1. We refer to petitioner's business as a modeling agency merely for convenience, not as a characterization of the business in any way.↩
2. Payments on the promissory note were to be made quarterly in four equal installments of $ 3,750 each.↩
3. The amount of the credit card processing fee depended upon whether petitioner owned the merchant account or was using a merchant account owned by someone else. See Credit Card Processing, infra↩ p. 7.